The JOHNS HOPKINS UNIVERSITY,
Appellee,

v.

William E. HUTTON et al., Appellants.

No. 13293.

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 5, 1969.

Decided Feb. 18, 1970.

1126

John F. King, Baltimore, Md. (John A. Wilson, Michael J. DeSantis, Robert A. Butler, and Shearman & Sterling, New York City, on brief) for appellants.

John Henry Lewin and Edmund P. Dandridge, Jr., Baltimore, Md. (Venable, brief), for appellee. Benjamin C. Howard, Royall, Koegel & Wells, Baltimore, Md., Bardusch, Johnson, Scheminger & Duncan, New York City, on brief for Ragnar D. Naess, and Naess & Thomas.

Before BOREMAN, BRYAN, and BUTZNER, Circuit Judges.

BUTZNER, Circuit Judge:

Johns Hopkins University brought this action against the partners of W. E. Hutton & Co., a stock brokerage firm, to rescind Hopkins' purchase of an oil and gas production payment from Trice Production Co. After extensive pretrial litigation, the district court (Kaufman, J.) granted Hopkins' motion for summary judgment on the ground that Hutton's employee, Gilbert H. LaPiere, had violated Section 12(2) of the Securities Act of 1933.[1] Johns Hopkins University v. Hutton, 297 F.Supp. 1165 (D.Md.1968). We hold genuine issues of material fact preclude the entry of summary judgment on the issue raised by Hutton's plea of the statute of limitations. On all other issues, the district court correctly entered summary judgment for Hopkins.

I.

The initial question presented by this appeal is whether the court erred in holding that the production payment met the statutory definition of a security. Hutton contends that as a matter of law it is not a security, and that in any event the question is beclouded by disputed issues of fact which should be submitted to a jury.

Production payments are frequently used financing devices in the oil and gas industry. The payment Hopkins purchased from Trice represented an interest in oil and gas reserves in the ground to be extracted from 23 specified wells. Trice, which retained an interest in the properties, agreed to extract and market the oil and gas and pay the proceeds

1. Section 12(2) of the 1933 Act [15 U.S.C. § 77l(2)] provides:

"Any person who—

\* \* \* \* \*

(2) offers or sells a security \* \* \* by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

from Hopkins' share to Hopkins until it recovered its purchase price of $1,-300,000. Also, Trice agreed to pay Hopkins from the production of the wells 6% return on the unpaid balance of the purchase price and a specified percentage of the net profit. Since certain of the wells were subject to a prior production payment, Trice guaranteed payment of the 6% return until the underlying production payment terminated.

The sale of Hopkins' production payment was not an isolated transaction. Trice sold two production payments to another investor and a second payment to Hopkins. Trice and LaPiere also sought to persuade a number of prospective investors, individually or through a syndicate, to purchase others. In all Trice planned to sell production payments in the amount of about $10,000,000.

■ Section 2(1) of the 1933 Act,[2] defines "security" as, among other things, an investment contract. And though the device be novel or uncommon, it may qualify as a security if, as a matter of fact, it has been "widely offered or dealt in under terms or courses of dealing which established [its] character in commerce as [an] 'investment contract' * * *." S.E.C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 351, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943). The definition of an investment contract found in S.E. C. v. W. J. Howey Co., 328 U.S. 293, 298, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), embraces Hopkins' production payment.

There the Court, teaching that form should be disregarded for substance and that emphasis must be placed on economic reality, said:

"[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise. * * * It embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."

■ The fact that Hopkins' production payment is unique because it deals, as do production payments generally, with specific wells does not exclude it from coverage of the Act. The transactions in *Howey* coupled the sale of acreage in a citrus grove with service contracts for the cultivation, harvesting, and marketing of the fruit. Since each sale involved a different plot of the orchard ranging in size from less than an acre to more than five acres, it is apparent that each investment contract was novel. Nevertheless, the Court held that the transactions were subject to the Act.[3]

2. Section 2(1) of the Securities Act of 1933 [15 U.S.C. § 77b(1)] provides:
 "When used in this subchapter, unless the context otherwise requires—
 "(1) The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for,

receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

3. Other contracts linking the sale of individual units or parcels of property with their care or servicing have been held to be securities. See, e. g., Continental Marketing Corp. v. S. E. C., 387 F.2d 466 (10th Cir. 1967), cert. denied, 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968) (beavers); S. E. C. v. Payne, 35 F.Supp. 873 (S.D.N.Y.1940) (silver foxes); Hollywood State Bank v. Wilde, 70 Cal.App.2d 103, 160 P.2d 846 (Dist.Ct. App., 2d Dist., 1945) (chinchillas); S. E. C. v. Bailey, 41 F.Supp. 647 (S.D.Fla. 1941) (tracts of land for growing tung trees).

Nor does the fact that Hopkins would not have purchased the production payment without Trice's guarantee preclude summary judgment on this issue. The definition of a security expressly includes a guarantee of any of the other devices enumerated in Section 2(1).[4] Therefore, a guarantee cannot have the effect of denying coverage to an instrument that otherwise satisfies the Act's definition of a security. Whether the guarantee is a part of the production payment or collateral to it is immaterial. In either event the entire transaction, including the guarantee, falls within the statutory definition of a security.

We conclude, therefore, that the district court correctly held as a matter of law that Hopkins' production payment was an investment contract within the meaning of the Act because it involved "an investment of money in a common enterprise with profits to come solely from the efforts of others," S.E.C. v. W. J. Howey Co., 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946), and because it satisfied the common offering and trading requirements set forth in S.E.C. v. C. M. Joiner Leasing Corp., 320 U.S. 344, 351, 64 S.Ct. 120, 88 L.Ed. 88 (1943).

## II.

Judge Kaufman properly analyzed and applied Section 12(2) of the 1933 Act, saying:

"Hutton violated Section 12(2) if, as a broker, it offered or sold to Hopkins, a security as defined by Section 2(1) of the '33 Act using the mails, or an instrument of, or communication in, interstate commerce to accomplish the same, by means of an untrue statement of material fact or by omitting to state a material fact necessary in order to render the statements Hutton made not misleading under the circumstances in which the statements were made; provided that Hopkins did not know of such untruth or omission, [and] that Hutton knew, or in the exercise of reasonable care, could have known of such untruth or omission * * *." 297 F.Supp. at 1208.

There can be no doubt that Hutton, a broker acting through LaPiere, offered and ultimately sold to Hopkins a security by using the mails or other means of interstate communication. There is also no doubt that significant—indeed probably the most important—information for Hopkins to consider in purchasing the production payment was the future net revenue for the 23 wells underlying the payment, for it was from this revenue that Hopkins expected to recoup its investment and make a profit. The amount of the future net revenue could not be measured; it could only be estimated, and the reliability of the estimate rested upon the judgment of the estimator. DeGolyer & MacNaughton (D & M) was among the most respected engineering firms engaged in supplying independent estimates of the worth of oil and gas properties. Trice furnished Hopkins a brochure which showed the estimate of the total future net revenue for all 23 wells to be $6,500,000. LaPiere represented that this estimate was made by D & M. LaPiere also represented that the D & M estimate showed a return of $2,905,000 as Hopkins' share of the future net revenues. LaPiere, however, knew that D & M had neither estimated all of the wells nor provided a basis for calculating Hopkins' share of the future net revenues. Moreover, LaPiere omitted to tell Hopkins that in order to show future net revenues of $6,500,000 it was necessary to substitute for conservative estimates on some of the wells higher estimates from other sources.

The district court held, and we agree, no genuine issue of fact was presented concerning the materiality of LaPiere's misrepresentations and omissions. A fact is material if it concerns information about which "an average prudent investor ought reasonably to be informed before purchasing the security * * *." Demarco v. Edens, 390 F.2d

4. See n. 2, supra.

836, 840 (2d Cir. 1968), citing 17 C.F.R. § 230.405(1). Or, as formulated by the Restatement of Torts § 538(2) (a) (1938): "A fact is material if * * * its existence or nonexistence is a matter to which a reasonable man would attach importance in determining his choice of action in the transaction in question * * *." The materiality of LaPiere's misrepresentations and omissions becomes readily apparent by comparing the estimate of future net revenues of $6,500,000 he vouched to Hopkins with the estimate of $5,355,744 Trice and LaPiere had previously furnished another investor. Clearly, a "reasonable man would attach importance" to this discrepancy of over a million dollars. Also, an "average prudent investor" ought reasonably to have been informed that independent appraisers furnished much lower estimates on some of the wells than the figures used to compile the total of $6,500,000.

 Generally the issue of materiality, resting as it does upon the reaction of a "reasonable man," cannot be decided by summary judgment. Rogen v. Ilikon Corp., 361 F.2d 260, 265 (1st Cir. 1966). But here the discrepancies in basic data are so large, and the facts misrepresented and withheld are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality. Since the underlying facts and the inferences to be drawn from these facts are free from controversy, summary judgment was appropriate. Cf. Mills v. Electric Auto-Lite Co., 403 F.2d 429 (7th Cir. 1968), rev'd on other grounds, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Whitlow & Associates, Ltd. v. Intermountain Brokers, Inc., 252 F.Supp. 943 (D.Hawaii 1966); S.E.C. v. Latta, 250 F.Supp. 170 (N.D.Cal.), aff'd 356 F.2d 103 (9th Cir. 1965), cert. denied 384 U.S. 940, 86 S.Ct. 1459, 16 L.Ed.2d 539 (1966); Guardian Investment Corp. v. Rubinstein, 192 A.2d 296 (D.C.Ct.App.1963).

 Hutton asserts that a genuine issue of fact exists over the question of whether Hopkins should be barred from recovery under Section 12(2) of the Act because it knew of the untruths and omissions on which judgment was entered. The facts, however, refute this contention. Shortly before the purchase of the production payment, Trice furnished information which disclosed that the estimates for thirteen wells came from sources other than D & M. To this extent the information revealed LaPiere's misstatements about the identity of the estimators. But in order to support the fictitious estimate of $6,500,000, Trice's report was false in a number of respects, and it, too, omitted to inform Hopkins that D & M had made smaller estimates on some of the wells than the estimates set forth in the report. The undisputed evidence shows that neither Hopkins, nor its advisers, learned from this report, or from any other source, the complete truth essential for prudent evaluation of the wells.

 Hutton next contends that the element of "causation" presents a genuine issue of fact precluding summary judgment. LaPiere's representations, Hutton says, did not cause Hopkins to buy the production payment. On the contrary, the argument runs, Hopkins made its purchase because of information it received from its own advisers and from Trice and also because of Trice's guarantee. Under Section 12(2), however, a buyer need not prove that he relied on the misstatement or omission. "To say that purchaser reliance is a prerequisite to seller liability is to import something into the statute which is not there." Woodward v. Wright, 266 F.2d 108, 116 (10th Cir. 1959). Accord, Trussell v. United Underwriters, Ltd., 228 F.Supp. 757, 768 (D.Colo.1964); Athas v. Day, 161 F.Supp. 916, 918 (D.Colo.1958); Thiele v. Shields, 131 F.Supp. 416, 419 (S.D.N.Y.1955); see 3 Loss, Securities Regulations 1702 (2d ed. 1961).

 Hutton's theory of "causation" is an impermissible attempt to introduce reliance upon the misrepresentations and omissions as a necessary element of Section 12(2). A similar ploy was summarily rejected in Demarco v. Edens, 390

F.2d 836, 841 (2d Cir. 1968), where the seller sought to defend on the ground that the sale was not "by means of" an offending circular. Information about future net revenues was essential to Hopkins' decision to purchase, and this information was tainted by LaPiere's material misrepresentations and omissions. These facts establish as a matter of law sufficient causal relationship between LaPiere's violation of the Act and Hopkins' injury. Hopkins need not also prove that the defects in LaPiere's data had a decisive effect on its contract. Cf. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Since Hutton's defense lacks warrant in law, it is no bar to summary judgment.

 Hutton, relying on Kamen & Co. v. Paul H. Aschkar & Co., 382 F.2d 689 (9th Cir. 1967), cert. granted 390 U.S. 942, 88 S.Ct. 1021, 19 L.Ed.2d 1129, cert. dismissed 393 U.S. 801, 89 S.Ct. 40, 21 L.Ed.2d 85 (1968), claims that the partners of the brokerage firm are not liable because they did not participate in, or have knowledge of, the representations made by their employee, LaPiere. Factual differences alone make *Kamen* inapplicable. There the court held the employee did not have apparent authority to enter into transactions that turned out to be fraudulent. Here, on the contrary, the evidence is undisputed that, although the Hutton partners were personally blameless, they clothed LaPiere with actual and apparent authority to provide Hopkins with information about the production payments. LaPiere, as manager of Hutton's oil and gas department, acted within the scope of his employment in offering the production payment to Hopkins, and for his service Trice paid Hutton a substantial commission. Hutton is liable, under familiar principles, for the tortious representations of its agent. Restatement (Second) of Agency §§ 257, 258 (1958). For reasons fully stated by Judge Kaufman[5] we agree that Section 15 of the Act [15 U.S.C. § 77o] was not intended to insulate a brokerage house from the misdeeds of its employees.

### III.

Section 13 of the Act [15 U.S.C. § 77m] provides in part:

"No action shall be maintained to enforce any liability created under section [12(2)] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence * * *. In no event shall any such action be brought * * * more than three years after the sale."

Hopkins sued well within the three-year period of limitations. Therefore, the issue is whether its action was commenced within one year after discovery of LaPiere's misrepresentations and omissions, or "after such discovery should have been made by the exercise of reasonable diligence." Hopkins filed its suit on November 1, 1963, so inquiry must concentrate on the nature and extent of Hopkins' knowledge before November 1, 1962, and particularly whether it used due diligence after its purchase on March 1, 1961 to discover the wrongs about which it now complains. See Rosenberg v. Hano, 121 F. 2d 818, 821 (3d Cir. 1941). The district judge found that the material facts were not in controversy and that Hopkins had not actually discovered LaPiere's misstatements and omissions before the critical date. Viewing the question of reasonable diligence as the application of a standard and therefore a question of law, he concluded Hopkins had exercised due diligence and that its action was not barred by the statute of limitations.

Before November 1, 1962 Hopkins learned that Trice was in financial trouble, that some of its checks were returned for insufficient funds, that Trice's report of its financial condition could not be reconciled with Dun & Bradstreet's, that the return from an-

---

5. Johns Hopkins University v. Hutton, 297 F.Supp. 1165, 1209 (D.Md.1968).

other production payment was behind schedule, that some of the wells underlying Hopkins' payment were not producing or were underproducing, and that an involuntary petition for bankruptcy had been filed against Trice.

To be sure, Hopkins and its advisers did not stand idly by as this bad news rolled in. They conducted investigations that led them to believe that Trice's troubles, and Hopkins' own worries, were caused by factors other than deficiencies in the estimates of the future net revenue. But the one-year limitation of Section 13 does not depend wholly on the subjective judgment of the buyer. Instead it must be tested by the objective standard of reasonable diligence on the part of the buyer in making discovery. Rosenberg v. Hano, 121 F.2d 818, 821 (3d Cir. 1941); cf. Goldenberg v. Bache & Co., 270 F.2d 675, 681 (5th Cir. 1959).

Perhaps, as Hopkins argues, Trice's shaky financial condition would not alert an investor to fraud. But surely the failure of some wells to produce as scheduled coupled with Trice's lack of candor about its finances might cause a reasonably diligent investor to probe the data upon which he based his purchase. Had Hopkins compared all the experts' reports, which it had a right to do under the terms of the production payment, it could readily have discovered the untrue statements and the omissions about which it now complains.

On summary judgment we must view the inferences pertaining to Hopkins' diligence in the light most favorable to Hutton, the party opposing the motion. Since inferences contrary to those drawn by the district judge might be permissible, a genuine issue of fact was raised that should have been submitted to a jury. United States v. Diebold, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). But Hopkins urges us to follow Dale v. Rosenfeld, 229 F.2d 855, 858 (2d Cir. 1956), which held that when a judge is the trier of fact the standard of due diligence is a question of law. And, continues Hopkins, since the issue of due diligence is a question of law, application of the statute of limitations was rightly decided by summary judgment. However, we need not in this case review the oft mooted question of whether a standard of care, such as reasonable diligence, presents a question of fact or of law or of both,[6] for the rule stated in *Dale* is not applicable here. Hutton has demanded a jury, and the *Dale* court recognized, albeit by implication, that when a jury is the trier of fact, the issue should be submitted to it. See also Mamiye Bros. v. Barber Steamship Lines, Inc., 360 F.2d 774, 777 (2d Cir.), cert. denied 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966) (dictum). It is sufficient for us to say that when, as here, a jury has been demanded and the facts give rise to conflicting inferences on the issue of reasonable diligence, the question must be submitted to the jury. Azalea Meats, Inc. v. Muscat, 386 F.2d 5, 9 (5th Cir. 1967); cf. Schillner v. H. Vaughan Clarke & Co., 134 F.2d 875, 878 (2d Cir. 1943).[7]

## IV.

Finally, on two remaining issues, we conclude, for reasons adequately stated by the district court, that rescission is a proper remedy[8] and that Hutton's motion to file a third party

---

6. Compare Mamiye Bros. v. Barber Steamship Lines, Inc., 360 F.2d 774, 776 (2d Cir.), cert. denied 385 U.S. 835, 87 S. Ct. 80, 17 L.Ed.2d 70 (1966), with Pacific Tow Boat Co. v. States Marine Corp., 276 F.2d 745, 752 (9th Cir. 1960). See Nuckoles v. F. W. Woolworth Co., 372 F.2d 286, 288 (4th Cir. 1967).

7. Hopkins also claims that Hutton is estopped to plead the statute of limitations because Hutton withheld unfavorable information that came to its attention after the sale. The district judge did not rule on this issue, and in the absence of the necessary factual background, we express no opinion about it.

8. Johns Hopkins University v. Hutton, 297 F.Supp. 1165, 1224 (D.Md.1968) (Kaufman, J.).

complaint against Hopkins' financial advisers was properly denied.[9]

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

**9.** Johns Hopkins University v. Hutton, 40 F.R.D. 338 (D.Md.1966) (Thomsen, C. J.).