Harlan LANE, Plaintiff,

v.

MIDWEST BANCSHARES CORPORA-
TION and W. B. Collett,
Defendants,

The FIRST NATIONAL BANK OF POIN-
SETT COUNTY, ARKANSAS, et al.,
Third-Party Defendants,

The United States of America,
Intervenor.

No. LR-71-C-32.

United States District Court,
E. D. Arkansas, W. D.

Jan. 31, 1972.

Cyril E. Hollingsworth, Jr., of Davidson, Plastiras & Horne, Little Rock, Ark., for Lane.

Edward Lester of Lester & Shults, Little Rock, Ark., for Midwest Bancshares and W. B. Collett.

Karl Blanchard, of Blanchard, Van Fleet, Robertson & Dermott, Joplin, Mo., for First State Bank of Joplin.

Phillip Carroll, of Rose, Barron, Nash, Williamson, Carroll & Clay, Little Rock, Ark., for Couch Leasing Corp.

Henry S. Wilson, Trumann, Ark., for First National Bank of Poinsett County, Arkansas.

Sidney H. McCollum, Asst. U. S. Atty., Eastern District of Arkansas, Little Rock, Ark., for the United States.

## MEMORANDUM OPINION

HENLEY, Chief Judge.

This case arises out of transactions which commenced in Little Rock, Arkansas, on March 27, 1970. On that date plaintiff, Harlan Lane, and defendant, W. B. Collett, entered into a written contract under the terms of which Lane was to sell to Collett 3,200,000 shares of common stock in a corporation known as La-Co, Inc., for a total price of $1,300,-

000. Collett was to pay Lane $25,000 in cash, give him one note for $150,000, payable in sixty days, and another note in the sum of $1,125,000 payable in four annual installments. Collett was acting at the time for defendant, Midwest Bancshares, Inc., a corporation which he controlled. Collett's rights under the contract [1] were assigned to Midwest. Collett paid the $25,000 in cash to Lane by means of a check drawn on an out of State bank; that payment was made contemporaneously with the execution of the initial contract. Collett was later reimbursed by Midwest. After the assignment of the contract to Midwest, the latter executed in Lane's favor the $150,000 note and the $1,125,000 note called for by the contract. Collett executed the notes as guarantor of Midwest's obligations.

Lane pledged the $150,000 note to a New Orleans bank, and that note was paid when it fell due. In the meantime Midwest and Collett at the request of Lane took back the $1,125,000 note and substituted for it thirteen smaller notes in varying amounts. The terms of the smaller notes were similar to those of the original note, and the first installment on those notes fell due on March 27, 1971.

Lane pledged the smaller notes to various creditors of his own including the First National Bank of Poinsett County, Arkansas, the First State Bank of Joplin, Missouri, the Fourth National Bank of Tulsa, Oklahoma, Continental Illinois Bank & Trust Co. of Chicago, Illinois, and Couch Truck Leasing Corporation of Little Rock, Arkansas. He also pledged two of the notes to the United States as collateral security for a substantial tax liability owed by him to the Government.

In January 1971 Midwest and Collett indicated that they would not pay the installment of the notes falling due on March 27, of that year, contending that the notes had been obtained by fraud on the part of Lane.

On February 2, 1971, Lane commenced this action against the defendants seeking declaratory and injunctive relief looking toward the establishing of the validity of the notes. After Midwest failed to pay the 1971 installment, Lane amended his complaint so as to accelerate all of the notes, and he now seeks judgment thereon for his own benefit and for that of his pledgees.

The defendants deny liability on the notes and by way of counterclaim affirmatively seek rescission of the 1970 contract and cancellation of the notes. They also seek to recover the $25,000 cash payment made to Lane, the $150,000 paid in satisfaction of the first note, damages, and an attorney's fee. They base their claim on alleged violations of Rule 10(b)–5 of the Securities & Exchange Commission 17 C.F.R., § 240.10(b)–5, and of section 22(a) (2) of the Arkansas Securities Act of 1959, Ark.Stats., Ann., § 67–1256 (a) (2). They allege that in connection with the sale of the La-Co stock Lane falsely represented that the corporation had a net worth of nearly $3,000,000 when in fact it had no net worth, that he falsely represented that two notes totaling about $538,000 owed by La-Co to an affiliated company, La-Co Leasing, were not due until February 22, 1972, when in fact they were in default, and that he failed to disclose very substantial liabilities and contingent liabilities of La-Co.

On April 20, 1971, the defendants sought leave to bring the pledgees of the notes into the case as additional parties. On June 10 the Court filed a memorandum opinion and entered an order authorizing joinder of the pledgees as additional counterclaim defendants as authorized by Rule 13(h) of the Federal Rules of Civil Procedure. Later, defendants' claims against the Fourth National Bank and the Continental Illinois Bank & Trust Co. were dismissed.

---

1. Actually, there were two contracts, one an informal, handwritten document prepared by Collett, and the other a more formal instrument prepared by counsel who were employed after the informal contract had been prepared and signed. Both documents are dated March 27, 1970.

First National Bank of Poinsett County, First State Bank of Joplin, and Couch Truck Leasing Corporation have all filed answers in which they take the position that they are holders in due course of the notes pledged to them.

As the case progressed, the Government sought and obtained leave to intervene. It does not contend that it is a holder in due course, but it does contend that all of the notes are valid, and that it has a tax lien on all of them or on the proceeds thereof.

In its memorandum of June 10, 1971, the Court considered the question of its jurisdiction of the cause and of the parties hereto; it concluded that it has jurisdiction, and it adheres to that view.

The cause has been tried to the Court and submitted upon a voluminous record and briefs. This memorandum incorporates the Court's findings of fact and conclusions of law.

The overall picture presented by the evidence includes a large number of financial transactions and involves a considerable number of individuals and corporations. It would serve no useful purpose to describe all of those transactions or to identify all of the parties involved. The Court will try to state its factual findings as succinctly as possible.

The plaintiff, Harlan Lane, is a fairly young man who was born and reared in Texas. While he has had little formal education, he has a considerable amount of business acumen and shrewdness by the exercise of which he has been able to acquire or at least gain control of large amounts of money. He has operated largely through the corporation form of business enterprise and is fully familiar with the business of buying and selling stocks, forming and merging corporations and like transactions.

At and prior to March 27, 1970 Lane was associated in business with Don Couch, one of the younger members of a family that has long been prominent in Arkansas business and financial circles. Lane and Couch both held stock interests in La-Co, and they were also interested in La-Co Leasing which leased automatic car washing equipment.

La-Co had about 9,000,000 shares of common stock outstanding in 1970, and before his dealings with Collett Lane owned 3,200,000 of those shares, which was enough to give him control of the assets and operations of the company. Of those 3,200,00 shares 1,200,000 were in pledge to banks in Alabama, Illinois, Louisiana, Oklahoma, and Texas and to La-Co itself.

In March 1970 the principal assets of La-Co consisted of a large block of stock in the Union National Bank of Little Rock, Arkansas (UNB) and a residential subdivision in Houston, Texas.

By virtue of his control of the UNB stock Lane was able in 1968 to become Chief Executive Officer of the bank. In that capacity he was able to control day to day operations of the bank and during his tenure as Chief Executive Officer he caused the bank to lend large sums of money to corporations in which he was interested, and to other corporations. Some of those loans were highly questionable from a banking standpoint. Couch, whose family had long been associated with the bank, was the nominal president of the institution, but Lane was in full charge of operations.

Dissatisfaction among bank directors and stockholders with Lane's administration of the bank's affairs led to the final ouster of Lane and Couch from the bank's management in late 1969 or early 1970, and in February 1970 Lane was indicted by the federal grand jury for a violation of 18 U.S.C.A. § 215, a serious misdemeanor but not one necessarily involving moral turpitude.[2]

---

2. The charge was that Lane had unlawfully stipulated for and received a commission of $125,000 on a $1,000,000 loan made to a corporation known as Wheel-Air, Inc. His trial began on March 28, the day after he made his contract with Collett. He was convicted, but the Court set the conviction aside on account of error in instructions. He was reindicted in 1971, was tried again, and again convicted. An appeal from that conviction is now pending.

W. B. Collett, like Lane, is an extremely knowledgeable business man, and he is a much better educated man than Lane. Collett's specialty has been accounting and financial management. He is fully familiar with stock transactions and with corporate finance, and has had a great deal of experience in those areas.

Neither Lane nor Collett fits the conventional image of the small and perhaps naive investor which generally comes to mind when one is thinking of legislation designed to prevent fraud and sharp practice in securities transactions. The business history of neither man has been characterized by conservatism or prudence. Both of them are speculators and shrewd dealers.

If men like Lane and Collett are to operate successfully, they must have access to large amounts of credit. For that reason control of or leverage upon financial institutions like banks is of vital importance to them. And Collett's business experience had extended to dealings in bank stocks and in acquiring and disposing of control of banks.

In 1970 Midwest was a holding company which was controlled by Collett, just as La-Co was controlled by Lane. In his dealings with Lane Collett was acting for Midwest, and Midwest duly accepted and ratified all that he did.

Prior to March 27, 1970, Lane and Collett were not personally acquainted, and Collett testified that he knew nothing about La-Co. Collett had heard of Lane in connection with UNB. He knew that Lane had lost control of that bank and had been indicted. Collett thought that Lane personally owned the UNB stock that was actually owned by La-Co, and he evidently thought that in the circumstances in which he was situated Lane would be willing to sell the stock and might sell it cheaply. In any event, Collett decided to try to acquire the stock.

With that acquisition in view Collett came to Little Rock on March 27, 1970, to negotiate with Lane, and figuratively speaking the curtain rises on their meeting which took place about 2:30 P.M. in Lane's office.

Collett was accompanied to Lane's office by one of Collett's associates, Hicks. However, Hicks did not remain very long and took no significant part in the conversation. The negotiations between Collett and Lane took place and the deal was closed without the presence or advice of counsel. The entire time consumed between the initial meeting of the two men and the final signing of the contract and the delivery to Lane of Collett's $25,000 check was not much, if any, in excess of two hours. Obviously, a substantial part of that time was consumed in the passing of the usual amenities and in Lane's explaining to Collett that the bank stock was owned by La-Co rather than by Lane personally.

While it appeared impracticable for Collett to buy the UNB stock as such, Lane volunteered to show Collett how to acquire control of that stock, namely by obtaining control of La-Co by buying Lane's stock in that concern. The men then began to negotiate to that end, using in that connection an uncertified balance sheet of La-Co that purported to speak as of November 20, 1969, and was, therefore, about four months old.

That balance sheet indicated that as of November 30, 1969, La-Co had assets of more than $5,000,000, liabilities of a little over $2,500,000, and a net worth of $2,-692,681.98. It is desirable to look at this financial statement in some detail.

The balance sheet reflected current assets consisting of cash, accounts receivable, and notes receivable, totaling $620,-229.40. It showed investments totaling $4,146,035.50, $3,595,941.00 of which was attributed to the UNB stock. The investment in La-Co Leasing, Inc. was shown to be $100,062.50. Other investments shown were: Weaver Investments, $100,000; United Construction, $90,000; Lake Hamilton Enterprises, $10,000; Highway 10 property, $65,032; and Auto Spa, Inc., $185,000. Under the heading "Inter-Company" appears a valuation of the Houston subdivision known as Oak

Ridge North. The rather ambiguous entry is: "Oak Ridge North/Equity Clearing Account, $504,178.34." Fixed and other assets which need not be detailed totaled about $8,000.

On the other side of the balance sheet we find listed total liabilities of $2,585,789.39. Current liabilities totaled only $197,074.89 and are not important here. Under the heading "Notes Payable" are listed eleven notes totaling $2,388,714.50.

The Court does not find that Lane represented to Collett that the balance sheet was current, and Collett as a skilled accountant must have known that it was not and must have known that it was not certified. It is abundantly clear from the evidence that Collett did not accept the asset figures at face value, and he must have known that at least some of the valuations were merely opinions. The Court finds that Collett relying on his own skill and experience revised certain valuations and came to his own conclusion as to what the La-Co investments, including the UNB stock, were worth; and the Court further finds in that connection that Collett was primarily interested in the bank stock, and that other investments were definitely of secondary importance to him.

On the other hand, it appears to the Court that Collett assumed that the list of liabilities appearing on the balance sheet was essentially correct. He made no effort to verify the list, and Lane did not tell him that there were very substantial liabilities and contingent liabilities that the balance sheet did not disclose. As far as net worth is concerned, the Court finds that as of March 27, 1970, La-Co did not have a net worth approaching the amount shown on the balance sheet, and the evidence discloses that when a full and complete audit of La-Co's affairs became available as of the end of 1970 it revealed a deficit of nearly $400,000.

At the conclusion of the negotiations Collett drew up an informal contract in his own handwriting which was signed by both him and Lane. At this stage it was decided that attorneys should be called in to prepare a formal contract. Attorneys Jack Files and Phillip E. Allen of the Little Rock Bar appeared at Lane's office about 5:00 P.M. Files was to represent Lane, and Allen was to represent Collett. Files had little expertise in securities law, but he did know that a person selling securities has a duty of disclosure. Allen, on the other hand, was an experienced securities attorney, and he had certain information about La-Co which he had gained while representing interests adverse to La-Co. The attorneys made some effort to discuss certain aspects of the transaction and were told that those aspects had been discussed already. It was made clear to the lawyers that Lane and Collett had made their deal and were satisfied with it, and that they did not want to hear any more "lawyers' talk." The lawyers then proceeded to prepare a formal contract, dated March 27, 1970, which was duly signed by Lane and Collett probably on March 28. As stated, the $25,000 check of Collett in favor of Lane was delivered on March 27.

On March 28 Collett succeeded Lane as Chief Executive Officer of La-Co. Within a very few days and substantially prior to the middle of April Collett and through him Midwest were well aware that La-Co's financial affairs were tangled to say the least and that it had many problems. They also knew that on March 17 the Arkansas Securities Department had launched an investigation into the affairs of La-Co, and that on April 8 the Arkansas Securities Commissioner had issued a stop order prohibiting any further dealings in La-Co stock. It is interesting to observe that that order recited that the books and records of La-Co were in such condition that neither a complete examination nor an audit could be performed; Collett as a qualified accountant must have known, of course, that a corporate financial statement such as a balance sheet is no more accurate than the books and records upon which it is based.

As of the middle of April the only cash outlay that had been made by the defendants was the $25,000 that had been paid to Lane; the $150,000 note was not due until May 27, and the first installment on the $1,125,000 note was not due until March 27, 1971.

At about this time Lane requested Midwest and Collett to substitute the thirteen smaller notes involved in this case for the single large note. Notwithstanding their knowledge of La-Co's uncertain and obviously bad condition, the defendants agreed to Lane's proposal and substituted the thirteen notes for the one without demur. They not only did that but did it with full knowledge that Lane was going to pledge the notes as additional security for his own indebtedness to various and sundry creditors.

As 1970 wore on the defendants became increasingly aware of the fact that they had made a poor investment, and they also became aware of the existence of the liabilities and contingent liabilities which the 1969 balance sheet had not disclosed. But still the defendants made no move to repudiate the thirteen notes. They kept on trying to salvage a profit out of the venture, and in that effort they eventually disposed of the UNB stock and sold the Oak Ridge property.

## I.

The basic controversy in the case is between Lane, on the one hand, and Collett and Midwest, on the other hand. If Lane is entitled to prevail, then *a fortiori* his pledgees and the Government are entitled to recover. For that reason the Court will take up first the basic controversy, and will ignore for the moment the controversy between the pledgees, on the one hand, and the defendants and counterclaimants, on the other hand.

Rule 10(b)–5 of the Commission, which implements section 10(b) of the Securities Act of 1934, 15 U.S.C.A., § 78j, insofar as here pertinent is as follows:

"Rule 10b–5. Employment of manipulative and deceptive devices.

"It Shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange

\* \* \* \* \* \*

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances, under which they were made, not misleading. . . ."

Ark.Stats., Ann., section 67–1256(a) (2) provides:

"67–1256. Civil liability.—(a) Any person who

\* \* \* \* \* \*

"(2) offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at six per cent [6%] per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security and any income received on it, or for damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at six per cent [6%] per year from the date of disposition."

It is now established that Rule 10(b)–5, hereinafter at times called simply "the rule," creates a private cause of action in favor of buyers and sellers of securities who have been the victims of decep-

tive practices where the purchases and sales have involved the use of means or instrumentalities of interstate commerce or of the mails. And the Arkansas statute in express terms confers a right of action upon buyers of securities who have been the victims of fraud or deceptive practices.

The definition of deceptive practice appearing in Rule 10(b)–5(b) is essentially the same as the definition appearing in section 12(2) of the Securities Act of 1933, 15 U.S.C.A. § 77*l*. Thus, the language of the Arkansas statute quoted above is quite similar to the language of both the rule and section 12(2) of the 1933 statute. It has been held in this Circuit that the Arkansas statute is actually geared to section 12(2) of the 1933 Act rather than to the rule. Vanderboom v. Sexton, 8 Cir., 1970, 422 F.2d 1233.

■ Private persons or corporations invoking the remedy provided by the Rule generally appear as plaintiffs in actions brought against alleged wrongdoers, but a claim under the Rule can be asserted, as here, by means of a counterclaim. That was the parliamentary situation presented in City National Bank of Fort Smith, Ark. v. Vanderboom, 8 Cir., 1970, 422 F.2d 221.[3]

■ In order to prevail in an action brought under the Rule, the claimant must show, in addition to the required involvement of the means or instrumentalities of interstate commerce or mail use, that the party sought to be charged was guilty of a misstatement of a material fact or of a failure to disclose a material fact in connection with the purchase or sale of a security, and, at least in this Circuit and in some other Circuits, that there was a justifiable reliance on the misstatement or failure to disclose. However, scienter or specific intent to defraud need not be shown. City National Bank of Fort Smith, Ark. v. Vanderboom, supra; Myzel v. Fields, 8

Cir., 1967, 386 F.2d 718; see also List v. Fashion Park, Inc., 2 Cir., 340 F.2d 457, and Kohler v. Kohler Co., 7 Cir., 1963, 319 F.2d 634.

■ A misstatement of fact or a nondisclosure is considered to be material if it concerns something that a reasonable man would consider important in deciding what he should do in a particular transaction. The concept of materiality "encompasses those facts 'which in reasonable or objective contemplation might affect the value of the corporation's stock or securities. . . .'" Myzel v. Fields, supra, 386 F.2d at 734, citing Kohler v. Kohler, supra, 319 F.2d at 642.

■ As far as reliance is concerned, there is at least some difference between cases involving affirmative misstatements and cases involving mere nondisclosures. As to the former, "the question is whether a reasonable investor, in light of the facts existing at the time of the misrepresentation and in the exercise of due care, would have been entitled to rely upon the misrepresentation." City National Bank of Fort Smith, Ark. v. Vanderboom, supra, 422 F.2d at 230. As to the latter, "the issue becomes whether a reasonable investor, in light of the facts existing at the time of the nondisclosure and in the exercise of due care, would have been entitled to receive full disclosure from the party charged and would have acted differently had the alleged nondisclosure not occurred." Ibid. The reasonable investor test is an objective one. Ibid. However, at least in a nondisclosure case, the question of actual reliance is a subjective one. Myzel v. Fields, supra, 386 F.2d at 737.

■■ While it may be conceded that the protection of the rule extends to sophisticated as well as to simple sellers and buyers of securities, it is clear that in determining whether a person is entitled to relief under the rule factors to be considered include the relative knowledge and sophistication of the parties to

---

3. The two Vanderboom cases cited above were companion cases, and both arose in the Western District of Arkansas. Both were decided by Senior Judge John E. Miller; his opinions appear in 290 F. Supp. 592 and 294 F.Supp. 1178.

the transaction and the relationship between them. And the extent of the duty of an "insider" to disclose information to an "outsider" to whom he is selling or from whom he is buying depends to some extent upon what the outsider knows himself or could readily find out and some regard is also to be had to the speed with which the outsider wants to deal. Myzel v. Fields, List v. Fashion Park, Inc., and Kohler v. Kohler Co., all supra.

█ Finally for the moment, it should be said that the aim of the rule "is to qualify, as between insiders and outsiders, the doctrine of *caveat emptor*— not to establish a scheme of investors' insurance." List v. Fashion Park, Inc., supra, 340 F.2d at 463. And the Court of Appeals for this Circuit has noted that the class of investors to be protected under the rule should be limited to "conscientious buyers and sellers in good faith." City National Bank of Fort Smith, Ark. v. Vanderboom, supra, 422 F.2d at 230, f. n. 10.

Ark.Stats., section 67–1256 is part of the Arkansas version of the Uniform Securities Act, Ark.Stats., sections 67–1235 et seq., and corresponds to section 410 of the Uniform Act, Vanderboom v. Sexton, supra, 422 F.2d at 1238.[4] There is as yet no substantial body of Arkansas case law construing and applying section 1256. However, since it is based on federal legislation, it is fairly inferable that the Supreme Court of Arkansas will give to it the same construction that the federal courts place *on corresponding* federal statutes and regulations.

While the defendants rely primarily on section 1256(a)(2) heretofore quoted, counsel calls attention to section 1256(f) which provides in substance that no person who has made or engaged in the performance of a contract in violation *of the Act or who has acquired any* purported right under any such contract with knowledge of the facts by reason of which the making or performance of the contract was in violation of the statute "may base any suit on the contract." It

is to be observed also that willful violations of the Act, including section 1256, constitute felonies, Ark.Stats., § 67–1255.

Section 1256 gives to a "defrauded" or "victimized" buyer of a security a cause of action either at law or in equity for rescission if he still has the security or for damages if he has disposed of it. The buyer cannot prevail, however, if he knew of the untruth or omission relied upon; nor can the buyer prevail if the seller is able to carry the burden of showing that his statements or omissions were innocent and nonnegligent.

The misstatement or omission which will form the basis for relief under section 1256 must relate to a "material" fact. The test of materiality does not differ in substance from that employed in cases arising under Rule 10(b)–5. In Johns Hopkins University v. Hutton, 4 Cir., 1970, 422 F.2d 1124, a case arising under section 12(2) of the Securities Act of 1933, it was said (422 F.2d at 1128–1129):

> " . . . A fact is material if it concerns information about which 'an average prudent investor ought reasonably to be informed before purchasing the security. . . .' Demarco v. Edens, 390 F.2d 836, 840 (2d Cir. 1968), citing 17 C.F.R. § 230.405(1). Or, as formulated by the Restatement of Torts § 538(2)(a) (1938): 'A fact is material if . . . its existence or nonexistence is a matter to which a reasonable man would attach importance in determining his choice of action in the transaction in question. . .'
> . . . "

It has been seen that in this Circuit justifiable reliance on a representation or omission is a condition of recovery in an action brought under the rule. However, in cases arising under section 12(2) of the Securities Act of 1933 it has been held that reliance by the buyer in the common law sense of the term is not material. Gilbert v. Nixon, 10 Cir., 1970, 429 F.2d 348, 356; Johns Hopkins Uni-

---

4. The section of the Arkansas statute that corresponds to Rule 10(b)–5 is Ark.Stats., § 67–1235.

versity v. Hutton, supra, 422 F.2d at 1129–1130; Woodward v. Wright, 10 Cir., 1959, 266 F.2d 108, 116. It would seem, however, that in a section 12(2) case, and presumably in a case arising under Ark.Stats., section 67–1256, there is still a requirement of reliance in the sense that the buyer is not entitled to relief if he knew of the untruth or omission; and it would appear that the burden is on the buyer to show his ignorance of the true facts, Woodward v. Wright, supra.

In approaching the task of applying the foregoing principles to the facts of the case and coming to an ultimate decision as to how the controversy between Lane and his adversaries should be decided, the Court deems it well now to state in more formal terms the facts that it considers to be of ultimate controlling importance.

1. The contract between Lane and Collett was made in Arkansas and the clearing of the check given by Collett to Lane involved the use of the mails. Thus, the transaction is governed by both Rule 10(b)–5 and Ark.Stats., section 67–1256 (a) (2).

2. The transaction between Lane and Collett was at arm's length; there was no fiduciary relationship between them, and there is nothing to indicate that Collett placed or had any reason to place any confidence in or reliance upon Lane as an individual.

3. Notwithstanding the arm's length nature of the transaction, Lane was under a duty not to intentionally or negligently make false representations to Collett with respect to material facts and not to intentionally or negligently fail to disclose material facts to Collett.

4. While Lane suggested to Collett that he acquire control of the UNB stock by buying Lane's La-Co stock, and while Lane exhibited the 1969 balance sheet to Collett, the Court does not find that Lane represented to Collett that the balance sheet was accurate or that it reflected the true condition of La-Co as of March 27, 1970. Such a representation would have

been preposterous, and had it been made, Collett would not have believed it.

5. Assuming that at least some of the values shown on the asset side of the balance sheet were inflated, Collett did not accept those values but came to his own conclusions as evidenced by his own notes that were made during the negotiations.

6. The liability side of the balance sheet did not disclose the existence of certain liabilities and contingent liabilities of La-Co that Lane knew or should have known were outstanding. The Court thinks that Lane was required under the law to disclose to Collett that liabilities existed that were not shown on the statement; Lane failed to do so. Whether his failure to do so was intentional or merely negligent is not material under Rule 10(b)–5, Myzel v. Fields and City National Bank of Fort Smith, Ark. v. Vanderboom, both supra. Nor is it material under section 67–1256.

7. The omission of Lane to disclose the existence of the liabilities in question amounted to an omission to state a "material fact."

8. Collett uncritically assumed, or seems to have assumed, that the list of liabilities appearing on the balance sheet was complete. In that sense and in that sense only he "relied" on the balance sheet or "relied" on Lane's failure to disclose that the list of liabiliites was not complete.

9. In contracting to pay $1,300,000 for the La-Co stock on the basis of an informal negotiation of approximately two hours' duration centering around a four month old uncertified balance sheet which he himself did not accept at face value, Collett was either grossly negligent or was recklessly entering into a highly speculative transaction for the purpose of acquiring control of the UNB stock without really caring what the true overall financial situation of La-Co was.

10. Collett and Midwest knew or were charged with knowledge that La-Co was in bad financial condition and that the

1969 balance sheet was by no means accurate before the $1,125,000 note was exchanged for the thirteen notes in suit and before the $150,000 note was paid. They also knew that Lane was going to pledge most if not all·of the thirteen notes to third parties. The defendants could have repudiated the transaction in Mid-April or early May, 1970; could have refused Lane's request for a substitution of notes; and could have refused to pay the $150,000 note; and in those connections could have assumed the same positions under Rule 10(b)–5 and section 67–1256 that they are assuming now. Instead, they went forward with the transaction and did not disavow liability until the beginning of 1971. By that time the UNB stock and the subdivision property· had been sold.

11. While counterclaimants have tendered back the La-Co stock that they acquired from Lane, the corporation control of which they are now tendering is not the same corporation as that the control of which they acquired in 1970 since its principal assets are gone. The Court does not know what the La-Co stock was actually worth in 1970, but it is certainly not worth now as much as it was then, if, indeed, it is worth anything.

When the facts in this case are viewed in their totality, the Court simply does not believe and is unwilling to hold that even as against Lane Midwest and Collett are entitled to any relief under either the rule or the Arkansas statute.

Collett did not come to Little Rock in March 1970 in the guise of a buyer seeking in good faith to make a sound investment. He came down here to make a deal for the UNB stock, and he made one. After he and his corporation knew or were charged with knowledge of the true facts, they took no steps to protect their interests.

Counterclaimants offer some explanations for their failure to take action earlier than they did, but the Court is not impressed by those explanations. The Court thinks that they made their bed in March 1970; that they elected to lie

in it for the rest of the year; and that they should continue to have to lie in it.

The Court will say that it is difficult to apply conventional "Blue Sky Law" concepts to the conduct of men like Lane and Collett in dealing with each other in connection with buying and selling securities; and, indeed,· it is somewhat unrealistic to try to do so. Rule ·10(b)–5 and section 67–1256 are designed to provide what the Court of Appeals has called an "umbrella of protection" to investors, City National Bank of Fort Smith, Ark. v. Vanderboom, supra, 422 F.2d at 232. But, men like Lane and Collett do not feel that they stand in need of any protection from each other and do not want any. They do not want sobering advice from accountants, and they do not like to hear "lawyers' talk." They want to do business and make deals, and the Court sees no reason to apply the rule or the Arkansas statute so as to rescue Collett and his corporation from the results of his own improvidence.

## II.

In view of the probability of an appeal from the Court's basic decision in the case, the Court deems it desirable to consider the question of whether the pledgee banks and Couch Truck Leasing Corporation stand on better footing as opposed to the defendants than does Lane. That question of course may not survive if the Court's basic holding is affirmed.

On this phase of the case a good deal of argument has been devoted to the question of whether the pledgees are "holders in due course" of the notes that have been pledged to them. There is no question that the pledgees are at least assignees of the notes for value and without notice that Lane may have violated Rule 10(b)–5 or Ark.Stats., section 67–1256 when he dealt with Collett.

As far as Rule 10(b)–5 is concerned, the status of the respective pledgees as assignees for value and without notice is probably sufficient to protect them regardless of whether they are "holders in due course" within the mean-

ing of relevant provisions of the Uniform Commercial Code which is in effect in both Arkansas and Missouri.

While section 29(b) of the Securities Exchange Act of 1934, 15 U.S.C.A., § 78cc(b), provides that contracts entered into in violation of the Act or of any rule of the Commission are "void," that section goes on to protect by necessary implication persons not parties to violations who have acquired contractual rights arising out of prohibited transactions without notice of the violations. And section 29(c) goes even further and provides in part that nothing in the Act shall "afford a defense to the collection of any debt or obligation or the enforcement of any lien by any person who shall have acquired such debt, obligation, or lien in good faith for value and without actual knowledge of the violation of any provision of this chapter or any rule or regulation thereunder affecting the legality of such debt, obligation, or lien."

■■■■■ However, to the extent that the status of the pledgees as "holders in due course" in the commercial sense of the term may be important, the Court will say without elaboration that it finds that the First National Bank of Poinsett County and Couch Truck Leasing Corporation are holders in due course within the meaning of Article 3–302(1) of the UCC, Ark.Stats., section 85–3–302(1), and hold their notes free from all defenses of any party with whom they have not dealt, except a defense based upon such illegality of the transaction as may render the obligations of Midwest and Collett "nullities." Ark.Stats., § 85–3–305(2) (b). The Court is not able to make such a finding with respect to the First State Bank of Joplin because the note pledged to it was never endorsed as required by Ark.Stats., sections 85–3–201 (3) and 85–3–202(2). See Annotator's Note 7 following section 85–3–201. The position of the Joplin bank is simply that of a bona fide assignee for value and without notice.

As has been seen, section 29(c) of the Securities Exchange Act of 1934 protects the rights of such assignees, and there is no reason to believe that a different view would be taken by the Supreme Court of Arkansas in a case arising under Ark. Stats., section 67–1256.

■■■■ Counsel for Midwest and Collett earnestly contends that by virtue of the "no action" provision appearing in subdivision (f) of section 67–1256 the notes in suit are absolutely void, and that the pledgees are not entitled to recover even if they are holders in due course within the meaning of the UCC. As indicated, that subsection provides that no person who has made or engaged in the performance of any contract in violation of any provisions of the Securities Act of 1959 "or who has acquired any purported right under such contract with knowledge of the facts by reason of which its making or performance was in violation may base any suit on the contract."

Counsel would draw an analogy between section 67–1256(f) and section 64–1202 which prohibits a foreign corporation which has not qualified to do business in Arkansas from maintaining any suit on any contract made in this State; and counsel cites Pacific National Bank v. Hernreich, 1966, 240 Ark. 114, 398 S.W. 2d 221, a case arising under section 64–1202. In that case a nonqualifying foreign corporation sold goods in Arkansas and received promissory notes in payment therefor; the notes were negotiated to the plaintiff bank which was unquestionably a holder in due course. It was held, one Justice dissenting, that the bank could not recover on the notes.

The Court thinks that the analogy that counsel would draw overlooks the protective language appearing in section 67–1256(f), which is similar to that appearing in section 29(b) of the 1934 federal statute, and which is completely lacking in section 64–1202. The Court does not accept the analogy or the argument based thereon.

### III.

One other aspect of the case remains for consideration. It is undisputed that in 1971 Midwest indirectly acquired four

of the Lane notes from the banks to which they were pledged. The defendants contend that those acquisitions extinguished the notes, and that they are not involved in this case. Plaintiff argues that the acquisitions, which were obviously for less than face values, should be considered simply as pro tanto payments on the notes, and that while defendants should be allowed credit for the amounts actually paid, they remain liable to plaintiff for the difference plus interest.

This phase of the case was not developed in any great detail in the evidence and has not been argued elaborately in the briefs. Defendants cite no authority in support of their position. Plaintiff cites 41 Am.Jur., Pledge & Collateral Security, § 80, which contains a terse statement to the effect that where collateral securities are sold by the pledgee to the original obligor, "the transaction will be treated as an unauthorized compromise of (the) debt, and the obligor may be held liable for the balance of the collateral." Section 80 is to be read in connection with the preceding section 79 in which it is pointed out that at least at common law a pledgee of choses in action, including promissory notes, was not permitted to sell them in the absence of a contractual stipulation giving him that power, and that he was required, instead, to sue the obligor on the obligation held as collateral. The quoted statement appearing in section 80 is based on nothing but a reference to a 1901 annotation appearing in 53 L.R.A. Counsel also cites the old Wyoming case of De Clark v. Waters, 10 Wyo. 31, 65 P. 855, which he says was also decided in 1901.

Article 9 of the UCC deals with secured transactions and includes within its scope pledges of commercial paper. Ark.Stats. § 85–9–504, provides that a holder of collateral has a right upon default of his obligor to sell the collateral in a commercially acceptable manner after due notice to his obligor. The Court sees nothing in the statute to prohibit a pledgee of promissory notes payable to the order of its own obligor from selling the notes should that obligor default, and the Court does not see that that obligor has any standing to complain if the purchaser is the original maker of the notes. Regardless of who buys the notes, the original pledger loses his title to them and the right to receive payment thereon.

For purposes of this opinion the Court will assume that when the four notes were acquired by Midwest or for its ultimate benefit, Lane was in default with respect to his own obligations to the respective pledgees, that he was given proper notice of the sale, and that the sales were conducted in a commercially permissible and reasonable manner.

On the basis of those assumptions the Court will limit recovery against the defendants to the nine notes that they have not acquired. If plaintiff has any trouble with the Court's assumptions, he may apply for a reconsideration of this particular problem in the case.

A judgment will be entered in favor of the plaintiff on the nine notes, the judgment to include interest, and an attorney's fee of 10 percent of the amounts due. All nine notes will be subject to the Government's tax lien; however, the Government will be required first to seek satisfaction of its claim out of the proceeds of the two notes that it holds. The Government's lien will be considered inferior to the claims of the First National Bank of Poinsett County, First State Bank of Joplin, and Couch Truck Leasing Corporation. Costs will be assessed against the defendants; their counterclaim will, of course, be dismissed with prejudice.