William L. GUNTER and Camille S. Gunter

v.

Theodore M. HUTCHESON et al.

Civ. A. No. C76–1702.

United States District Court, N. D. Georgia, Atlanta Division.

March 4, 1980.

On Motion of Reconsideration and Rehearing May 12, 1980.

Harold L. Russell, Thomas W. Rhodes, Jane K. Wilcox, Gambrell, Russell & Forbes, Atlanta, Ga., for plaintiffs.

J. D. Fleming, John A. Chandler, H. Wayne Phears, Sutherland, Asbill & Brennan, Atlanta, Ga., Myers N. Fisher, Robert J. Green, Legal Div., Washington, D. C., Jerry Bonneau, Chattanooga, Tenn., for FDIC.

## ORDER OF COURT

MOYE, Chief Judge.

This action is one of many to arise out of the failure of the Hamilton National Bank of Chattanooga (HNB/C). On December 31, 1974, the plaintiffs purchased 61% of the stock of the Hamilton Bank and Trust Company of Atlanta (HB&T/A) for $5.5 million from defendant Theodore M. Hutcheson. The Gunters allege that during the negotiations preceding the stock purchase some of the defendants caused fraudulent misrepresentations concerning the financial condition of HN&T/A to be made to the Gunters. These alleged misrepresentations include, among others, the following:

\* \* \* \* \* \*

(b) The Chattanooga Bank would leave seven million dollars in certificates of deposit in the Atlanta Bank for at least one year from the Gunters' acquisition of the stock;

(c) The Atlanta Bank had and would continue to have a federal funds line of at least one million dollars ($1,000,000) through the Chattanooga Bank;

\* \* \* \* \* \*

(f) The Atlanta Bank was projected to make five hundred thousand dollars ($500,000) per year, and Mr. and Mrs. Gunter would make enough in dividends from the Atlanta Bank to pay interest on the notes; and

(g) The interest on notes given by Mr. and Mrs. Gunter would be deferred until January, 1977, and upon the giving of a balance sheet showing the separate assets and liabilities of Mr. Gunter, apart from those of his wife, new notes would be substituted for notes to be given at the closing of the Gunters' purchase of the stock, and those new notes would be payable by Mr. Gunter only. The new notes would provide for interest payments only for the first two years, with principal to be payable thereafter over a ten year period at ten percent of principal per year for seven years and the remaining thirty percent of principal in the last year.

Amended Complaint, ¶ 16(b), (c), (f), (g). These alleged misrepresentations were not in writing, were not executed by the HNB/C, were not approved by the Board of Directors of the HNB/C, and were not official records of the HNB/C.

In order to finance the acquisition of the HB&T/A stock, the Gunters borrowed $5.5 million from HNB/C, giving HNB/C two notes in the original principal amounts of $2.5 million and $3 million and securing those notes with the HB&T/A stock. Only the $3 million note is involved here.

On February 16, 1976, the Comptroller of the Currency declared the HNB/C insolvent and appointed the FDIC as receiver. The FDIC in its capacity as insurer may adopt either of two procedures when faced with a bank failure. It may arrange for payment of insured deposits and then liquidate the bank's assets over a period of time, or alternatively, assist the receiver in arranging what is commonly known as a "purchase and assumption" transaction. The latter procedure usually enables the FDIC to minimize the losses to its deposit insurance fund, avoid the disruption of a payout, and provide maximum protection to depositors of the failed bank. In the case of the failure of the HNB/C, the FDIC determined to use the purchase and assumption procedure in order to achieve the aforementioned goals. Miailovich affidavit ¶¶ 2, 4, 6; Agreement of Sale between FDIC as receiver and FDIC as corporate insurer (Exhibit B to Miailovich affidavit) (hereinafter Agreement of Sale) pp. 1–2.

The adoption of the purchase and assumption procedure required the FDIC to find a bank willing to assume the liabilities of the failed bank when paid a compensating amount of assets. Although the transaction was effected quickly to maintain the "going concern value" of the failed bank, the liabilities of HNB/C exceeded its assets by $70 million—$384 million of liabilities as compared to $314 million of assets. To obtain the right to purchase the HNB/C liabilities, First Tennessee National Bank (FTNB) bid approximately $16 million, thus reducing the net liabilities-assets discrepancy to approximately $54 million. The FDIC in its capacity as insurer may, pursuant to 12 U.S.C. § 1823(e), provide financial assistance to the receiver to facilitate a purchase and assumption, and in this case the FDIC agreed to pay the receiver $54 million. Miailovich affidavit ¶¶ 2, 4, 6.

In order to effect the purchase and assumption with the promptness necessary to ensure the retention of the going concern value of the failed bank's assets, the purchasing bank cannot immediately examine the loans of the failed bank to determine whether they are of acceptable quality. Miailovich affidavit ¶ 7. The purchaser is thus given a period of time in which to examine the loans and to return to the receiver any unacceptable loans. *Id.*; Purchase and Assumption Agreement between First Tennessee National Bank and the FDIC as receiver (Exhibit A to Miailovich affidavit) (hereinafter Purchase and Assumption Agreement) § 3.1(c). One of the means by which the FDIC as corporate insurer attempts to effectuate the aforementioned goals of a purchase and assumption is by agreeing to acquire from the receiver any returned assets, Miailovich affidavit ¶ 7, and in this case it did acquire the Gunter note from the receiver for $3,220,794.50 after it was returned by FTNB. Agreement of Sale § 1.1. When the FDIC acquired the Gunter note in its corporate capacity, it had no actual knowledge of any violations of the securities laws. Miailovich affidavit ¶ 9.

The plaintiffs, William L. and Camille S. Gunter, seek rescission and damages for alleged fraud in connection with their purchase of stock in the HB&T/A; against the FDIC, the Gunters seek only rescission. Plaintiffs have attempted to state claims under the following theories: (1) Count I—Securities Exchange Act § 10(b), 15 U.S.C. § 78j(b); Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5; and Exchange Act § 29, 15 U.S.C. § 78cc; (2) Count II—1933 Securities Act § 17(a), 15 U.S.C. § 77q; (3) Count III—Ga.Code Ann. §§ 97–112(a) and 97–114; (4) Count IV—Ga.Code Ann. §§ 105–301, 302, and 304; and (5) Count V—common law fraud and deceit. The FDIC has counterclaimed for payment on the $3 million note given by the Gunters to HNB/C (and now held by the FDIC) to finance the purchase of stock. The case is presently before the Court on the motion of defendant FDIC for summary judgment with respect to plaintiffs' claims and defendant FDIC's counterclaim. For purposes of this motion the FDIC admits plaintiffs' allegations of fraud.

Defendant FDIC advances two legal theories in support of its motion for summary judgment. First, the FDIC argues that under 12 U.S.C. § 1823(e) it may disregard any agreement which the Gunters seek to enforce against the FDIC. At oral argument and in its post-argument brief, the FDIC emphasized a related argument—*i. e.* that federal common law allows the FDIC to disregard any fraud upon which the Gunters rely in seeking to invalidate the note.[1] Second, the FDIC contends that Section 29 of the Exchange Act precludes the use of the fraud allegation by the Gunters against

---

1. In their post-hearing brief, the Gunters argue that the FDIC failed to state federal common law as a ground for their motion as required by Fed.R.Civ.P. 7(b). This argument is of no avail for several reasons. First, plaintiffs have not specified any relief to which they would be entitled; it would be a tremendous waste of everyone's time for the Court to ignore the argument now, only to have the FDIC file another motion based on that ground. Second, the Gunters have briefed the merits of the issue. Third, the issue is closely related to the section 1823(e) issue.

the FDIC in its capacity as insurer because it acquired the Gunter note in good faith, for value, and without actual knowledge of any violations of the securities laws. Plaintiffs respond in several ways. First, they argue that a transferee of a note takes no greater rights than his transferor had. Second, they insist that 12 U.S.C. § 1823(e) is inapplicable on these facts. Third, they contend that there is no principle of federal common law which protects the FDIC. Fourth, they contend that the FDIC has failed to satisfy the requirements of Section 29 of the Exchange Act because the FDIC has not really acted in two separate capacities with respect to its handling of the Gunter note and further because the FDIC had notice of defenses to collection on the note. Finally, they maintain that in any event Section 29 provides no defense to their claims based on Securities Act Section 17 and common law fraud. In reply to the latter argument the FDIC argues that for several reasons the Gunters have no cause of action under Section 17 and further that under common law, bona fide purchaser principles the FDIC had no notice of any fraud when it obtained the note in question.[2]

### I. 12 U.S.C. § 1823(e).

■ Defendant's primary argument, based on 12 U.S.C. § 1823(e), relies upon the following language from that provision:

No agreement which tends to diminish or defeat the right, title or interest of the Corporation in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from time of its execution, an official record of the bank.

Although there are several cases dealing with the applicability of 12 U.S.C. § 1823(e), none are very helpful in resolving the precise issue confronting this Court. Section 1823(e) immunizes the FDIC from such defenses to payment on a note as collateral agreements to make future loans, *FDIC v. Allen*, CA No. C78–592A (N.D.Ga. June 21, 1979); *FDIC v. Vogel*, 437 F.Supp. 660, (E.D.Wis.1977), to cancel a note if the purpose of the loan proves unobtainable, *Dasco v. American City Bank & Trust Co.*, 429 F.Supp. 767 (D.Nev.1977), to fund loans made to a guarantor's business, *FDIC v. Smith*, 466 F.Supp. 843 (N.D.Ga.1979), and to treat overdrafts as a loan, *West v. FDIC,* 149 Ga.App. 342, 254 S.E.2d 392 (1979). This case is more difficult than those because in this case the Gunters assert fraudulent inducement as a basis for rescission of the note.

The parties have pointed to only one case on point, but its rationale is very questionable. In *FDIC v. Rockelman*, 460 F.Supp. 999 (E.D.Wis.1978), on facts very similar to these, the court upheld the FDIC's attempt to shield itself from allegations of fraud allegedly committed by the FDIC's predecessors in interest. The court's entire reasoning was as follows:

This Court has been deeply involved in actions arising out of the insolvency of American City Bank and has long considered the various problems that have arisen as a result. In addition to cases already resolved, some forty cases involving the FDIC and various individuals or legal entities are currently before this Court.

Because of this Court's involvement, it has carefully weighed the problems addressed in this case. The Court has examined the relevant federal statutes, the case law concerning the FDIC in similar

---

**2.** The Gunters have also objected to these arguments on the ground that they were not stated in the original motion. *See* note 1 *supra*.

situations, and the history and purpose of the FDIC.

Based on this analysis the Court concludes that, although the FDIC, in its corporate capacity, is not a holder in due course within the meaning of that term under the Uniform Commercial Code, Congress intended by means of Section 1823 to clothe the Corporation with the protections afforded a holder in due course and shield the Corporation against many defenses that would otherwise be available. This is the purpose and effect of this section.

This conclusion furthers the intent of Congress to promote soundness in banking and to aid and protect the FDIC in the conduct of its duties. While there are some valid defenses that may be available against the FDIC, the Court need not address that issue at this juncture.

As far as the instant case is concerned, the Court is convinced, after its careful analysis, that the affirmative defense of fraud in the inducement alleged in this case is not a valid defense against the FDIC in its corporate capacity.

460 F.Supp. at 1003. This Court is unable to discern exactly on what basis the *Rockelman* court found 12 U.S.C. § 1823(e) applicable,[3] as it made no attempt to fit the fraud claim into the "no agreement . . . shall be valid" language of Section 1823(e).

Another case involving the failure of the HNB/C appears to be the only case in which the Section 1823(e) immunity has been rejected. *Riverside Park Realty Co. v. FDIC*, 465 F.Supp. 305 (M.D.Tenn.1978). As might be expected, plaintiffs rely upon that case heavily. There the plaintiff alleged that the FDIC's predecessors HNB/C and Hamilton Mortgage Company had breached the terms of a contract under which the FDIC sought payment on a note. The court concluded that the statute's reference to "agreement" was only intended to refer to independent agreements *separate* from the original transaction and not to the very agreement sued on. 465 F.Supp. at 312. Plaintiffs in this case argue that the fraud here was intrinsic to the original agreement. Neither the express language of Section 1823(e) nor any policy made known to the Court require that the word "agreement" be read to mean only an agreement "separate" from the original loan transaction.

Plaintiffs argue that some of the cases construing Section 1823(e) in the FDIC's favor involve attempts to obtain money judgments against the FDIC. They contend that this case is different because the Gunters seek only rescission, but they fail to show how that difference is material. At best, plaintiffs simply argue that they cannot obtain rescission from the FDIC in its capacity as receiver because it is not the holder of the note. The fact that plaintiffs may have no one else to sue for rescission appears to have been contemplated by Congress in drafting the statute, because the language of the statute admits of no different treatment for rescission actions from that accorded damage actions.[4] The "no agreement . . . shall be valid" form of the statute just as easily contemplates a rescission as a damage action.

The plaintiffs have emphasized that Section 1823(e) prohibits enforcement of "agreements". There is arguably a "side agreement" here—to buy the stock—of which the misrepresentations were a part. Indeed, some of the misrepresentations can themselves perhaps be deemed agreements. *See e. g.* Complaint ¶ 16(b), (c), (f), and (g) *supra* p. 549. As defendant states it in its brief, "if this court holds that this [statute] can be avoided by the simple expedient of claiming that alleged 'side agreements' were part of a fraudulent scheme . . . breaches of alleged 'side agreement' will become 'securities fraud. . . .'" Defendant's brief of July 18, 1979 at 18.

The "shall be valid" language of Section 1823(e), however, does not so readily fit the

---

3. *See* note 7 *infra.*

4. *See Smith*, where the FDIC sued on a note and Judge Murphy held that because of section

1823(e) "no money judgment is available to the defendants nor may their counterclaims act as a set-off. . . ." 466 F.Supp. at 845.

facts of this case. Plaintiffs do not contend that the "side agreements" referred to above are "valid." To the contrary the essence of this lawsuit is plaintiffs' contention that those "agreements" are "illegal" or "invalid." Defendant has not presented the Court with any logical theory for accommodating the instant facts to that language. As indicated, *supra* p. 552, this emphasis on the "shall be valid" language does not interfere with the availability of the Section 1823(e) defense in other rescission actions against the FDIC, provided that in such action the FDIC shows, as the statute requires, that the would-be-rescinder is seeking to establish the "validity" of an "agreement."

Plaintiffs have also argued that Section 1823(e) is akin to a statute of frauds; like a statute of frauds, they continue, Section 1823(e) should be subject to the defense of fraudulent inducement. *E. g. Inman v. Wallace*, 558 S.W.2d 554 (Tex.Civ.App. 1977); *Connelly v. Merritt*, 273 So.2d 7 (Fla. Dist.Ct.App.1973). A similar argument has been rejected by one court. *Vogel*, 437 F.Supp. at 663.[5]

■ Defendant argues that Section 1823(e) is more like a holder in due course rule than a statute of frauds; a holder in due course, of course, takes free of claims and defenses of fraudulent inducement. U.C.C. § 3–305. The most significant similarity between Section 1823(e) and either a statute of frauds or a holder in due course rule lies in the "writing" requirement. *Compare* 12 U.S.C. § 1823(e) ("No agreement . . . shall be valid . . . unless such agreement (1) shall be in writing . . . ."); Ga.Code Ann. § 20–401 ("[T]he promise must be in writing . . ."); U.C.C. § 3–305 (defining rights of a holder in due course of an "instrument" which is in turn defined as a "writing" in U.C.C. § 3–104). The signature requirement in a statute of frauds, *e. g.*, Ga.Code Ann.

§ 20–401, and in the definition of "instrument," U.C.C. § 3–104, is analogous to the requirements in Section 1823(e) that the agreement be "executed," "approved by the board of directors," and maintained as "an official record of the bank." 12 U.S.C. § 1823(e)(2)–(4). The holder in due course rule, however, goes much further, requiring negotiation (U.C.C. § 1–201) to one who takes an instrument "for value . . . in good faith . . . [and] without notice . . . ." in order to obtain this exalted status and the concomitant freedom from a claim or defense of fraudulent inducement. The Court thus concludes that Section 1823(e) is as much in the nature of a statute of frauds as a holder in due course rule. The Court need not go so far as to hold that 12 U.S.C. § 1823(e) is the exact equivalent of a statute of frauds.

The Court thus concludes that Section 1823(e) is inapplicable.

## II. Federal Common Law

As an alternative argument, defendant maintains that plaintiffs are estopped, under principles of federal common law, from raising against the FDIC the claim or defense of fraud. In *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the FDIC made a loan of over $1 million to an FDIC-insured bank in connection with the assumption of the bank's liabilities by another bank and acquired the petitioner's notes as collateral. The petitioner D'Oench, Duhme & Co. had sold the bank bonds which defaulted. It gave the bank the notes "to enable the bank to carry the notes and not show any past due bonds." Receipts for the notes stated that "This note is given with the understanding it will not be called for payment. All interest payments to be repaid." *Id.* at 454, 62 S.Ct. at 678. Petitioner's president knew that the purpose of giving the bank the

---

5. The *Vogel* court rejected an analogy to the statute of frauds and the application of the partial performance exception thereto because,

> Section 1823(e) is not simply a statute of frauds. It is based on a federal public policy. It operates to insure that the FDIC, when it expends money intrusted to it to purchase assets of a closed insured bank, can rely on the bank's records and will not be risking an impairment of the assets through an agreement not contained in the bank's records.
> 437 F.Supp. at 663.

notes was "keep[ing] the notes alive." *Id.* The issue before the Supreme Court in *D'Oench* was whether petitioner's liability on the notes was governed by state law or federal law. The Court first observed that had "the petitioner and the bank arranged to use the note for the express purpose of deceiving respondent on insurance of the bank, or on the making of the loan, the case would be on all fours with *Deitrick v. Greaney,* [309 U.S. 190, 60 S.Ct. 480, 84 L.Ed. 694 (1940)]." *Id.* at 457, 62 S.Ct. at 679. *Deitrick* involved an act violative of a federal banking statute; the Court there held that public policy prohibited the defendant from relying on his own wrongful act to defeat an obligation owed to the FDIC. Similarly, in *D'Oench,* the Court concluded that "Public policy requires that a person who, for the accommodation of the bank executes an instrument which is in form a binding obligation, should be estopped from thereafter asserting that simultaneously the parties agreed that the instrument should not be enforced." *Id.* at 459, 62 S.Ct. at 680. In reaching this conclusion the Court apparently considered two factors. First, the Court recognized a "federal policy . . . to protect [the FDIC] from misrepresentations made to influence the action of [the

FDIC] . . . ." and concluded that such policy dictated the result.[6] *Id.* The Court also observed that the petitioner "lent himself to a scheme or arrangement" which was "likely to mislead" the FDIC. *Id.* at 460, 62 S.Ct. at 681.

While the reasoning employed in *D'Oench* and in several cases relying thereon is fairly clear, it is not clear how, if at all, that reasoning applies to the facts of the instant case. More specifically, it is not clear what, if any, applicability those cases have to a situation, such as this, where there is no indication that anyone intended to deceive the FDIC or that the plaintiffs were involved in or "lent themselves to" any fraudulent scheme. The *D'Oench* line of cases provides at least a generalized basis, however, for concluding that the FDIC should be protected against plaintiffs' reliance on a claim or defense of fraud of which the FDIC was unaware.[7]

■ This generalized basis becomes more concrete upon application to the instant facts of (1) the Supreme Court's recent analysis of federal common law in *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979),[8] and (2) Exchange Act Section 29. The Court in

---

**6.** The Court actually stated, "Those principles call for an affirmance of the judgment below." It is thus arguable, therefore, that any other reasoning was dicta.

**7.** Perhaps the leading *D'Oench* progeny is *FDIC v. Meo,* 505 F.2d 790 (9th Cir. 1974). The plaintiff in that case executed a note to a bank to acquire common stock in the bank. The bank ordered its broker to issue voting trust certificates instead, and, since they were held by the bank as collateral, the plaintiff never saw them. When the bank failed, the FDIC obtained plaintiff's note in its capacity as receiver. The FDIC relied solely upon *D'Oench* in arguing that the plaintiff was estopped to avoid the note for failure of consideration. The Court rejected the FDIC's position, reasoning that the *D'Oench* principles required some sort of participation by the plaintiff. *Id.* at 791–92. Such an interpretation of *D'Oench* seems to emphasize the equitable principles of *D'Oench* over the public policy of preserving the integrity of banking institutions. A later Ninth Circuit case emphasized that the plaintiff need not know of the fraud but only must "lend himself" to the scheme to be estopped. *FDIC v. First Nat. Fin. Co.,* 587 F.2d 1009, 1012 (9th Cir.

1978). The court distinguished *Meo* as a case where "there was no secret agreement whereby the assets of the bank would be overstated. There was simply a failure of consideration of which the promissor was unaware until after the bank was closed and the suit was filed by the FDIC." *Id. First National* thus apparently condemned the result of overstating assets rather than the purpose of doing so. This in combination with its emphasis on the slight extent to which the maker must be involved in order to be estopped, exhibits a strong policy of protecting the FDIC against transactions of which it is ignorant. A strong expression of such a policy is arguably found in *Rockelman* (quoted *supra* pp. 551–552), although the court did not expressly mention *D'Oench* or the Ninth Circuit cases.

**8.** The parties have not discussed *Kimbell Foods* in brief or oral argument. The Court has received seven briefs on this motion, and believes that it understands the positions of the parties well enough that further briefing of the effect of *Kimbell Foods* is not necessary.

*Kimbell Foods* observed that the application of federal common law requires a two-part analysis. First, the Court must determine whether federal common law applies at all. With respect to that issue, the Supreme Court "has consistently held that federal law governs questions involving the rights of the United States under nationwide federal programs." *Kimbell Foods*, 440 U.S. at 724, 99 S.Ct. at 1457. Where the United States exercises authority derived from acts of Congress "passed in the exercise of a 'constitutional function or power,'" federal common law controls.[9] *Id., quoting Clearfield Trust Co. v. United States*, 318 U.S. 363, 366, 63 S.Ct. 573, 574, 87 L.Ed. 838 (1943). In the instant case the FDIC was exercising authority granted it under 12 U.S.C. § 1823.

█ The second, "more difficult task . . . is giving content to this federal rule." *Kimbell Foods*, 440 U.S. at 726, 99 S.Ct. at 1458. To hold that federal common law governs, however, does not necessarily require the adoption of a uniform federal rule.[10] *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 594–95, 93 S.Ct. 2389, 2397–2398, 37 L.Ed.2d 187 (1973); *Clearfield Trust*, 318 U.S. at 367, 63 S.Ct. at 575. Several factors bear upon the decision whether to incorporate state law or to formulate a nationwide federal rule as the Court did in *D'Oench*. First, one must consider whether the federal program in question "[is] and must be uniform in character throughout the Nation." *Kimbell Foods*, 440 U.S. at 727, 99 S.Ct. at 1458. Second, one must determine "whether application of state law would frustrate specific objectives of the federal programs." *Id*. Third, it is necessary to ascertain "the extent to which application of a federal rule would disrupt commercial relationships predicated on state law." *Id*. at 728, 99 S.Ct. at 1459.

█ In order properly to apply these criteria here, it is necessary to review the analysis employed by the Supreme Court in *Kimbell Foods*. The opinion in that case dealt with two cases, one involving a loan by the Small Business Administration (SBA) and the other a loan by the Farmers Home Administration (FHA). The Court was faced with the question of whether the priorities of those loans were to be determined by state or federal law.

First, in *Kimbell Foods* the Court found no need for a uniform federal rule because SBA and FHA operating procedures required compliance with state law in perfecting security interests. Moreover, the Court felt that since each loan application is closely scrutinized for credit-worthiness, no significant delay in the processing of loans could be attributed to a requirement that the loans be evaluated under state law. 440 U.S. at 729–734, 99 S.Ct. at 1459–61. In the instant case, the FDIC does have an interest in the uniform treatment of notes which it obtains in a purchase and assumption transaction. It would be difficult, if not impossible, for the FDIC to evaluate expeditiously an insolvent bank's numerous loans which might be governed by different rules of law of several different states. To preserve the going-concern value of the failed bank's assets, the purchase and assumption must be implemented quickly—in this case, overnight. Indeed the note made its entire journey from HNB/C to the receiver to FTNB back to the receiver, and then to the FDIC as insurer in a month. The need for such expeditious implementation of a purchase and assumption suggests that the FDIC must be governed by a uniform rule requiring that it be on guard only against fraud of which it has actual knowledge at the time the purchase and assumption transaction begins. If it then knows of fraud, it might elect to implement a purchase and assumption anyway, reasoning either that the overall cost would be less even after the FDIC is stuck with a worthless note or that the FDIC has a good chance of recovering in a fraud suit from

---

9. *Meo* expressly held that "federal law controls in cases involving the rights of the FDIC. . . ." 505 F.2d at 793 n. 4, *citing D'Oench*, 315 U.S. at 457, 62 S.Ct. at 679.

10. Several cases have rejected the application of Uniform Commercial Code principles to the FDIC. *E. g. Smith*, 466 F.Supp. at 845.

those who committed the fraud. Where the note involved has a very high face value and/or where there are slight chances of recovery in a fraud suit, the FDIC might choose a straight liquidation over a purchase and assumption. If a different rule were permitted, the FDIC would be forced to enter or not enter the transaction on the basis of incomplete information and thus at great risk.

Second, the Court in *Kimbell Foods* found that the application of state law would not frustrate the objectives of the federal program. The Court rejected the argument that SBA and FHA loans should receive the same treatment as federal tax liens on the grounds that "[t]he overriding purpose of the tax lien statute obviously is to ensure prompt revenue collection" in contrast to SBA and FHA loans which serve a "social welfare" purpose. 440 U.S. at 734, 99 S.Ct. at 1462. In the tax lien area, the United States is an "involuntary creditor . . . unable to control the factors that make tax collection likely," whereas in the context of SBA and FHA loans "when the United States acts as a lender or guarantor, it does so voluntarily, with detailed knowledge of the borrower's financial status." *Id.* In purchase and assumption transactions the FDIC cannot investigate the collectibility of a failed bank's assets until some time after the transaction has been implemented. To make the FDIC responsible for the fraud of its predecessors in interest of which it has no actual knowledge would limit the ability of the FDIC to utilize a purchase and assumption transaction. Specifically, it would cause the FDIC to enter such transactions without complete information with respect to the amount of worthless paper it may be obtaining and as to the number of lawsuits it might have to bring to recover for fraud upon its predecessors.

Finally, the *Kimbell Foods* Court found that application of federal law would disrupt commercial affairs based on state law. The Court reasoned that "Creditors who justifiably rely on state law to obtain superior liens would have their expectations thwarted whenever a federal contractual security interest suddenly appeared and

took precedence." 440 U.S. at 738, 99 S.Ct. at 1464. Even if one assumes that purchasers of securities, such as plaintiffs here, rely upon the various state and federal expressions of the law of fraud to protect them against deceit by sellers, that reliance will be misplaced at the point at which some rule of law such as Exchange Act Section 29 comes into play. It would disrupt commercial affairs only to the limited extent that a purchaser particularly relies on state as opposed to federal statements of the law of fraud.

■ Only the final factor, therefore, cuts at all against the adoption of a uniform federal rule protecting the FDIC against fraud in situations such as the instant one, and it does so in a limited way. The plaintiffs' reliance on the state law of fraud must be balanced against the need for a uniform rule absolving the FDIC of any duty to investigate the many notes it obtains in a short period of time and the need to preserve the objectives of the FDIC's purchase and assumption program. The Court need not rely solely on that balancing analysis for there is in Exchange Act Section 29 a clear expression of the way in which federal law deals with innocent holders of notes tainted by securities fraud. The public policy and statutory interests in a purchase and assumption transaction and the statutory interest in the protection of innocent holders of notes used to purchase securities convince the Court that state law has no role in this dispute between the plaintiffs and the FDIC.

Accordingly, on the basis of federal common law, the Court GRANTS the FDIC's motion.

III.  Exchange Act Section 29

The defendant has argued in its motion and brief that if it fails to get summary judgment on the entire case, then it nevertheless is entitled to summary judgment with respect to plaintiffs' Section 29 claim. Specifically, the FDIC argues that it is the sort of innocent purchaser protected under subsections (b) and (c). Section 29 provides in part:

(b) Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void . . . (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation . . . .

(c) Nothing in this chapter shall be construed (1) to affect the validity of any loan or extension of credit (or any extension or renewal thereof) made or of any lien created prior or subsequent to the enactment of this chapter, unless at the time of the making of such loan or extension of credit (or extension or renewal thereof) or the creating of such lien, the person making such loan or extension of credit (or extension or renewal thereof) or acquiring such lien shall have actual knowledge of facts by reason of which the making of such loan or extension of credit (or extension or renewal thereof) or the acquisition of such lien is a violation of the provisions of this chapter or any rule or regulation thereunder, or (2) to afford a defense to the collection of any debt or obligation or the enforcement of any lien by any person who shall have acquired such debt, obligation, or lien in good faith for value and without actual knowledge of the violation of any provision of this chapter or any rule or regulation thereunder affecting the legality of such debt, obligation, or lien.

Securities Exchange Act § 29(b), (c), 15 U.S.C. § 78cc(b), (c). Defendant contends that it lacked the knowledge specified in Section 29 when it acquired the note in question. Further, in an apparent attempt to head off plaintiffs' argument that the purchase and assumption transaction was not a good faith acquisition for value it also urged in its first brief that the FDIC operates in two capacities—as receiver and as corporate insurer. It correctly anticipated plaintiffs' position, for they argue at length that the FDIC does not in fact maintain two separate capacities. The legal end result of this argument has not been made entirely clear, but apparently plaintiffs urge the Court to conclude (1) that there was no transfer, (2) that any transfer was not made in good faith, and/or (3) that no value passed. Plaintiffs argue in the alternative that notice, and not knowledge, is the proper standard and that the FDIC had notice of sufficient facts to make it question the validity of the Gunter note. Finally, plaintiffs contend that even if the Section 29 defense is established, it applies only to claims under the Securities Exchange Act and not to Securities Act or state law claims.

At the outset, the Court must mention defendant's reliance on *Shipley v. FDIC*, CIV–1–78–11 (E.D.Tenn. March 22, 1979). The *Shipley* court granted the FDIC's motion for judgment notwithstanding the verdict reasoning as follows:

Mr. Bonneau testified that the FDIC paid value for the note and took the note in good faith without any knowledge or awareness that it may have been executed in violation of any banking law or regulation. There was no evidence to the contrary.

To the extent that the *Shipley* court was concerned with the evidence adduced at *that* trial, it is distinguishable from the evidence presented in *this* motion for summary judgment. More importantly, that case did not even mention, let alone discuss, the argument presented by plaintiffs here. The case is therefore unpersuasive here.

An analysis of the Section 29 defense reveals (1) a viable defense to plaintiffs' 1934 Act claims, as well as (2) support for this Court's view on federal common law which it stated in Part II. First, the Court notes that it is not entirely clear which part of Section 29 is at issue. Fortunately, the same result obtains under each. It seems

that Section 29(b) and (c)(1) establish acquisition with actual knowledge as an essential element of the plaintiffs' cause of action, while Section 29(c)(2) provides a defense to a defendant who (1) acquires (2) in good faith (3) for value (4) without actual knowledge. Plaintiffs could thus avoid the FDIC's argument under Section 29 by establishing the absence of any of those four factors. Plaintiffs have established without dispute that there are certain interrelationships and overlaps between the FDIC as receiver and the FDIC as corporate insurer, but they have not persuaded the Court that those facts are material as to a good faith acquisition for value.

A. "Good faith"

The plaintiffs' argument that the defendant does not operate in two capacities seems most relevant to the "good faith" question. As defendant argues, case law clearly establishes that the FDIC *may* operate in two capacities for some purposes. *E. g. FDIC v. Ashley,* 585 F.2d 157 (6th Cir. 1978); *FDIC v. Godshall,* 558 F.2d 220 (4th Cir. 1977). Plaintiffs correctly note, however, that those cases dealt with capacity in the context of whether federal jurisdiction was proper under 12 U.S.C. § 1819.

▮ Even if the precedent cited is not controlling, the good faith in the purchase and assumption is reflected in the functional and policy justification for the purchase and assumption:

First, the sale of the "unacceptable assets" to the FDIC in its corporate capacity reduced the risk of loss to the FDIC as an insurer of deposits and facilitated the assumption of [HNB&C's] deposit liabilities and "acceptable assets" by the [FTNB].

\* \* \* \* \* \*

Second, the assignment agreement eliminated the need for constant court supervision of a receivership. A receiver needs court authority for the disbursement of funds to pay expenses, the negotiation of settlements, the issuance of accountings, and the payment, pro rata, of creditors. By virtue of the assignment

agreement, the FDIC owned the "unacceptable assets" and could liquidate them without court supervision.

Finally, there was an uninterrupted continuation of bank business operations. *Ashley,* 585 F.2d at 163; *See also* Miailovich affidavit ¶¶ 2, 4, 6 (discussed *supra* p. 549). While such goals conceivably could be achieved without the division of the FDIC into two capacities, the fact remains that such a division has been Congressionally mandated. The FDIC Act clearly contemplates that the FDIC as receiver may sell notes and that the FDIC as corporate insurer may buy notes:

(d) Receivers or liquidators of insured banks . . . shall be entitled to offer the assets of such banks for sale to the Corporation . . .,

(e) Whenever in the judgment of the Board of Directors such action will reduce the risk or avert a threatened loss to the Corporation and will facilitate a merger or consolidation of an insured bank with another insured bank, or will facilitate the sale of the assets of an open or closed insured bank to an assumption of its liabilities by another insured bank, the Corporation may, upon such terms and conditions as it may determine . . . purchase any such assets . . . ..

12 U.S.C. § 1823.

The plaintiffs argue that this statutory division of capacities is not so clear in light of certain other language in the Act and in the FDIC's regulations. For example, 12 U.S.C. § 1822(a) provides that the FDIC as "receiver" may pay expenses "of liquidation." In addition, plaintiffs note that under the FDIC's regulations a "liquidator" administers a "receivership." *See* 12 C.F.R. §§ 306.2, 306.3. In reply the FDIC correctly contends that a "liquidation" must be effected no matter which of the two liquidation options is chosen and that "liquidator" is simply a personnel term. 12 C.F.R. § 306. Plaintiffs also urge that when the FDIC buys assets of a closed bank which it serves as receiver, the statute refers to the FDIC both as receiver and as insurer, sim-

ply as "the Corporation." The statutory scheme quoted above, however, clearly differentiates between the receiver on the one hand, and, on the other hand, the insurer.

■ Plaintiffs have made a strong factual record in support of their argument that there is a great overlap between the operations of the receiver and corporate insurer. Most importantly, the FDIC employed the same "liquidator in charge" "as receiver" and "as liquidator." The FDIC maintained no separate offices in Chattanooga for performance of the two functions it performed, and the liquidator in charge did not know whether other FDIC employees in his office were performing receiver or corporate insurer functions. While this unclear division of responsibility may cause the Court to wonder whether it is necessary for the FDIC to have the two capacities, it does not convince the Court that the purchase and assumption, a Congressionally approved, transaction with a legitimate regulatory purpose, lacks good faith.

### B. "Acquired"

■ Under subsections (b) and (c), the FDIC must also establish that it "acquired" the Gunter note.[11] The Miailovich affidavit states that the FDIC in its corporate capacity "purchased" the note for $3,220,794.50. In addition, the contract between the FDIC as receiver and FDIC as corporate insurer provides for such an acquisition by the FDIC as corporate insurer. Agreement of Sale § 1. Plaintiffs' most significant argument to the contrary is that the Gunter note was neither physically moved nor endorsed when the FDIC purportedly "acquired" it. However, the fact that they seek rescission from the FDIC admits that the defendant has "acquired" the note; indeed, in their complaint they expressly seek rescission from the FDIC as "holder" of the note. Amended Complaint ¶ 22.

### C. "Value"

■ Third, the FDIC acquired the note for payment of over $3 million to the receiver, Miailovich affidavit, ¶ 8, thus satisfying the "value" requirement of Section 29. The plaintiffs' only attempt to controvert this fact was the statement in their supplemental response to defendant's statement of undisputed material facts, without any citation to the record, that the defendant did not "pay" in the ordinary commercial sense.

### D. "Knowledge"

■ The final element of the Section 29 defense to rescission is the lack of "actual knowledge of the violation." Securities Exchange Act § 29(c)(2), 15 U.S.C. 78cc(c)(2). The Court observes first that the operative language is not "knowledge" but "actual knowledge." Second, subsection (c)(2) speaks of actual knowledge "of the violation," while subsections (b) and (c)(1) refers to actual knowledge "of facts by reason of which the making of such loan . . . is a violation of . . . this chapter . . . ." Subsection (c) thus establishes a stiff burden for plaintiffs. In the face of this explicit language, plaintiffs argue that the governing standard is not "actual knowledge . . ." but rather "notice." Further, they argue that the FDIC was on notice of irregularities in the Gunter note from the time it first agreed to take back the Gunter note. Defendant points to the purchase and assumption agreement between the receiver and the FTNB and the contract between the receiver and corporate insurer, emphasizing that neither contains any reference to unacceptable notes. However, those contracts apparently assumed the unacceptability of the notes that were to be returned from FTNB for Miailovich stated that it would be assets of "poor

11. At oral argument, counsel for the FDIC acknowledged that this was not an "ordinary commercial transfer." Although the precise meaning of this "non-commercial" characterization is not entirely clear, it certainly does not follow from this characterization that the transfer was a "paper transfer" without "commercial substance." Plaintiffs' Post-Hearing Brief at p.15. The Court believes that the transfer was "non-commercial" in the sense that it was designed to achieve the results mentioned in *Ashley, supra* p. 558, and in the Miailovich affidavit, *supra* p. 549.

quality," "possibly uncollectible," and "[un]acceptable" which would be returned. Miailovich affidavit, ¶ 5. Without intending any decision as to whether this is sufficient to constitute notice, the Court believes that the "knowledge/notice" issue can be best resolved by first determining whether "knowledge" or "notice" is the controlling standard.

The Court notes at the outset that the plaintiffs have made no serious attempt to argue that the FDIC had "knowledge." In their supplemental response to defendant's statement of undisputed material facts they only state that the FDIC knew that all the returned loans suffered from some "irregularity." Accordingly, because the Court concludes for the reasons stated below that "knowledge" is the controlling standard, the defendant has established the final element of the Section 29 defense.

Plaintiffs argue correctly that the courts have construed Section 29(b) to embody the common law concept of illegal bargains, providing for "voidability" of contracts made in violation of the law. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 387, 90 S.Ct. 616, 623, 24 L.Ed.2d 593 (1970); *Occidental Life Ins. Co. v. Pat Ryan Assoc., Inc.*, 496 F.2d 1255, 1266 (4th Cir.), *cert. denied* 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974); *Pearlstein v. Scudder & German*, 429 F.2d 1136, 1149 (2d Cir. 1970) (Friendly, J., dissenting); *Gannett Co. Inc. v. Register Pub. Co.*, 428 F.Supp. 818, 830 (D.Conn. 1977). Such a reading of Section 29(b) has prevailed over the statute's express use of the word "void" instead of "voidable." Thus, conclude plaintiffs, the "actual

knowledge" language in subsection (c) must be read to mean "notice," as notice, they contend, is the common law limitation on rescission of illegal bargains. In support of this conclusion they cite cases which make reference to a "notice" standard. *Okin v. SEC*, 154 F.2d 27, 31 (2d Cir. 1946); *Lane v. Midwest Banchares Corp.*, 337 F.Supp. 1200, 1211 (E.D.Ark.1972). Those references are obviously dicta, however. Moreover, those very same cases have also cited the "actual knowledge" standard. *Okin*, 154 F.2d at 31; *Lane*, 337 F.Supp. at 1211–12. Further, the courts have read the "void" language in subsection (b) as "voidable" to prevent those who have themselves committed fraud from obtaining rescission of a void contract. *E. g. Mills,* 396 U.S. at 387, 90 S.Ct. at 623. No such policy is present where the defendant is not the alleged defrauder.

▮ For the foregoing reasons the Court believes that the FDIC satisfies the requirements of Exchange Act Section 29. Not only does this provide a reason for granting the FDIC's motion as to the Exchange Act claim, but it also supports the conclusion reached in Part II that federal common law requires that the FDIC not be held liable for fraud in this case.

### IV. Effect of Section 29 on 1933 Securities Act Counts

Defendant next contends that it is entitled to summary judgment on plaintiffs' Count II which is based on Securities Act § 17(a), 15 U.S.C. § 77q. It has offered several arguments for dismissing this Count,[12] including the contention that not to impose the limitations found in Ex-

---

12. The FDIC maintains that the plaintiffs have no implied private cause of action under section 17(a), relying on this Court's earlier holding to that effect in this case. *Gunter v. Hutcheson*, 433 F.Supp. 42 (N.D.Ga.1977). The courts have not spoken clearly on whether the principles employed in implying private causes of action apply to situations such as this where the plaintiffs seek rescission both on their own claim and as a defense to the FDIC's counterclaim. One court has held that section 29 applies to Securities Act claims, rendering transactions voidable when they ·violate that Act. *Occidental Life Ins. Co. v. Pat Ryan & Assoc.,*

*Inc.*, 496 F.2d 1255, 1267 (4th Cir. 1974). Although the plaintiffs in *Occidental Life* attempted to state a claim under section 17(a), *id.* at 1260 n. 1, the court's opinion does not make it explicit whether the court was applying section 29's "voidability" principle to section 17 or to other sections of the 1933 Act such as sections 11 and 12. The recent Supreme Court opinion in *Transamerica Mtg. Advisors v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), seems to apply the principles used in implying a private cause of action even to a determination whether a cause of action for rescission should be implied. *See id.* at 25, 100 S.Ct. at

change Act Section 29 on Securities Act causes of action would give the Securities Act much "broader sweep" than the Exchange Act. FDIC's Second Reply Brief at p. 4. It would be most ironic to hold that Section 29(c)'s express innocent purchaser limitation on a cause of action is not applicable to a cause of action or defense under Section 17(a), because no express cause of action or defense is provided in that section. Plaintiffs contend that if Congress had intended in Section 29 to limit the rights granted in the 1933 Act, it demonstrated in Section 29 that it knew how to do so and thus could have done so expressly.

Although the applicability of Section 29 is limited to "this chapter"—*i. e.* the 1934 Exchange Act,—the Fourth Circuit has held that Section 29 can affect a claim under the 1933 Securities Act, reasoning that the two Acts must be construed *in pari materia. Occidental Life*, 496 F.2d at 1265–67. More specifically, the Court held that the "voidability" principle of Section 29(b) [13] applies to Securities Act claims. The Fifth Circuit has also recognized the principle that the two Acts are to be read *in pari materia*, even with respect to a provision in the Exchange Act which, like Section 29, is expressly limited in application to the Exchange Act.[14] *Tullis v. Kohlmeyer & Co.*, 551 F.2d 632, 635 (5th Cir. 1977). The Second Circuit has also employed the *in pari materia* principle in deciding whether puni-

tive damages are available under the 1933 Act. *Globus v. Law Res. Svc., Inc.*, 418 F.2d 1276 (2d Cir. 1969). The court in *Globus* held that the limitation in Exchange Act Section 28(a) to actual damages would apply to Securities Act claims as well because to hold otherwise "would create an unfortunate dichotomy between the 1933 and 1934 Acts." *Id.* at 1286. "To avoid such inconsistencies courts have endeavored to treat the 1933 and 1934 Acts *in pari materia* and to construe them as a single comprehensive scheme of regulation." *Id.* Significantly, that Court emphasized the irony mentioned earlier which would inhere in implying a cause of action under Section 17(a) without imposing upon that cause of action the express limitations found in the 1934 Act. *Id.* at 1284.

■ Given the foregoing precedents, the Court concludes that any cause of action or defense which the plaintiffs might be able to state under Securities Act Section 17(a) is limited by Exchange Act Section 29. Thus there is an independent reason for granting the motion as to the Section 17 claim as well as more support for the holding in Part II that the FDIC is entitled to summary judgment under principles of federal common law.

## V. State Law Claims

■ The Court concludes, based on the principles of federal common law (Part II)

---

250 (White, J. dissenting). This Court need not resolve the issue of whether the plaintiffs have a cause of action for rescission, because even if they do, the Court believes that the cause of action is cut off where the FDIC satisfies the innocent purchaser requirements of Exchange Act section 29.

The FDIC also contends that the plaintiffs have not shown the requisite privity between themselves and the FDIC, relying upon *Hill York Corp. v. American Int'l. Fran's, Inc.*, 448 F.2d 680 (5th Cir. 1971); *Collins v. Signetics Corp.*, 443 F.Supp. 552 (E.D.Pa.1977); *Hardy v. Sanson*, 356 F.Supp. 1034 (N.D.Ga.1973). Plaintiffs maintain that no privity is required under section 17, relying upon *Schaefer v. First National Bank*, 326 F.Supp. 1186, 1193–94 (N.D.Ill.1970), and that they are in privity with the FDIC, relying upon *Hill York, supra.* The Court need not resolve this dispute for the reason mentioned in the previous paragraph.

**13.** *See* p. 560 *supra.*

**14.** The court in *Tullis* was construing Exchange Act § 28(b), 15 U.S.C. § 78bb(b), which provides:

(b) Nothing in this chapter shall be construed to modify existing law (1) with regard to the binding effect on any member of any exchange of any action taken by the authorities of such exchange to settle disputes between its members, or (2) with regard to the binding effect of such action on any person who has agreed to be bound thereby, or (3) with regard to the binding effect on any such member of any disciplinary action taken by the authorities of the exchange as a result of violation of any rule of the exchange, insofar as the action taken is not inconsistent with the provisions of this chapter or the rules and regulations thereunder.

and on the principles embodied in the federal securities laws (Parts III and IV), that no state law claim of fraud may be stated against the FDIC, because the FDIC has acquired the note in question in good faith, for value, and without actual knowledge.

## VI.  Summary

Section 1823(e) is inapplicable because the plaintiffs do not seek to hold "valid" the alleged side "agreements." (Part I.) The FDIC is entitled to complete summary judgment under principles of federal common law. (Part II.) In addition, the FDIC has satisfied the specific requirements of Exchange Act Section 29. (Part III). This provides an independent reason for granting the motion with respect to the Exchange Act claim; in addition the satisfaction of Section 29 supports the holding in Part II.  Once it is determined that the FDIC is entitled to summary judgment on the Exchange Act claim, it follows in this case that it is likewise entitled on the 1933 Act claim because of the *in pari materia* doctrine. (Part IV).  This too adds support to the holding in Part II.  Finally the FDIC is not obligated to satisfy state innocent purchaser standards to avoid liability for fraud. (Parts II and V).

SO ORDERED.

## ON MOTION OF RECONSIDERATION AND REHEARING

Presently before the Court is plaintiffs' motion for reconsideration and rehearing and in the alternative for certification pursuant to 28 U.S.C. § 1292(b).  The defendant FDIC opposes those motions and moves for entry of final judgment in its favor. The plaintiffs oppose the latter motion.

## MOTION FOR RECONSIDERATION

Plaintiffs have urged reconsideration of the Court's March 4, 1980 order granting the FDIC's motion for summary judgment. They contend (1) that federal common law does not protect the FDIC from claims and defenses based upon fraud, (2) that the Court elevated "form over substance" in its analysis of Exchange Act section 29, and (3)

that the Court incorrectly applied section 29 to claims and defenses under the 1933 Securities Act.  The following discussion is as brief as possible and should be read in the context of a supplement to the March 4 order.

## I.  Federal Common Law

As indicated in the March 4 order, the Court saw no need to ask for further briefing on this issue because the Court had already received seven (now eleven) briefs on the FDIC's motion and had also heard extensive oral argument.  At p. 550 n. 1. Further, the plaintiffs have still not suggested any reason why the issue could not be raised after the original motion was filed.  The Court believes it significant that in the instant motion the plaintiffs have challenged only the Court's interpretation of applicable law and have not offered to present any evidence which would tend to create any issue of fact material under the law as the Court has interpreted it.

The thrust of the plaintiffs' position on the merits of the federal common law issue is that neither *Kimbell Foods* nor *D'Oench* and its progeny shelter the FDIC from claims or defenses of fraud and that the FDIC should be subject to state law holder in due course concepts.  First, the Gunters contend that

It is precisely when Congress has not spoken "*in an area comprising issues substantially related to an established program of government operation,*" [*United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 593, 93 S.Ct. 2389, 2397, 37 L.Ed.2d 187 (1973)], that *Clearfield* directs federal courts to fill the interstices of federal legislation "according to their own standards."  *Clearfield Trust Co. v. United States, supra,* 318 U.S. 363, at 367, 63 S.Ct. 573, at 575, 87 L.Ed. 838.

*Kimbell Foods,* 99 S.Ct. at 1458 (emphasis added).  Plaintiffs then argue "In this case Congress has spoken in an *area substantially related to the situation in issue*: in 12 U.S.C. § 1823(e) . . . ."  Plaintiffs' brief of March 12, 1980 at p. 4 (emphasis

added). The facial appeal to this argument is lost when one notices the difference in the language emphasized by plaintiffs and that emphasized by the Supreme Court. The Court spoke of substantial relationship to a government program; plaintiffs refer to a substantial relationship between the "situation in issue" (presumably meaning the claims of fraud) and section 1823(e). The Court concludes that Congress has not spoken to the issue of claims or defenses of fraud against the FDIC and that the availability of such a claim or defense against the FDIC is an issue "substantially related to an established program of government operation" (i. e., the FDIC's purchase and assumption program).

The Gunters further contend that had Congress intended to protect the FDIC from fraud it would have done so in section 1823(e). That argument is perfectly logical, but it is equally reasonable to assume that Congress saw no need to mention fraud when section 1823(e) was enacted in 1950 on the assumption that fraud was covered under the Supreme Court's ruling in D'Oench. Also, "it bears noting that the Court of Appeals in D'Oench specifically held that the FDIC should be treated as a holder in due course under the Negotiable Instruments Law which was then in effect, even though the FDIC had acquired the debtor's note in a purchase and assumption transaction like the one in issue here." FDIC's brief of November 30, 1979 at p. 9 n.* (citing D'Oench, 117 F.2d 491 (8th Cir. 1941), aff'd on other grounds, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). This holding could have been known to Congress when it enacted 12 U.S.C. § 1823(e) in 1950. All of this discussion about Congressional intention with respect to the then existing case law is, of course, extremely speculative, and the legislative history behind the section simply reiterates the language of the statute itself. See [1971] U.S.Code Cong. & Admin.News, pp. 3765, 3774. Legislative intent with respect to this issue, if there was any, thus can most realistically be derived from the general purpose of legislation affecting the FDIC—to preserve the FDIC's ability to insure the country's banking system.

Next, the Gunters differ with this Court's application to this case of the three factors considered by the Supreme Court in Kimbell Foods in ascertaining the content of any rule of federal common law. First, they say that the FDIC program is not uniform throughout the nation. Plaintiffs' brief of March 12, 1980 at p. 5. In support of that argument they rely upon FDIC v. Sumner Fin. Corp., 602 F.2d 670, 679 n. 12 (5th Cir. 1979) and Meo. In the portion of Sumner cited by plaintiffs, the Fifth Circuit was simply discussing the dual capacity of the FDIC as insurer and receiver, and in so doing it alluded to the difference between the FDIC's role as receiver of a state bank and its role as receiver of a national bank. The cited portion of Sumner thus has nothing to do with a purchase and assumption in a national bank. Meo will be discussed below.

Further, with respect to the "uniformity" inquiry required by Kimbell Foods, the Gunters contend that even if the FDIC should be governed by a uniform body of law, there is no reason to adopt a rule that always produces a uniform result—i. e., that "that the FDIC should always be able to defeat the rights of innocent individuals induced by fraud to give their notes to an insured bank." Plaintiffs' brief of March 12, 1980 at p. 6. The Court's ruling does not always produce a uniform result; the FDIC would not be able to defeat the rights of a maker where the FDIC had actual knowledge of fraud. The Court's ruling simply ensures that the FDIC will not have to make a hasty—perhaps overnight—determination of how many of a failed bank's assets may be infected by fraud.

With respect to the second factor in Kimbell Foods, the Gunters contend that the FDIC always has notice of various factors making certain obligations obtained in a purchase and assumption transaction uncollectible. Notice of uncollectibility is, of course, not equatable with knowledge of fraud, and the Court believes that it would impose a much greater burden on the FDIC to make it responsible for any fraud which taints the obligations which the FDIC assumes.

Finally, with respect to the third consideration in *Kimbell Foods*, the plaintiffs urge that adherence to the UCC provides a better rule, because the UCC is relied upon in commercial affairs throughout the nation. The Court acknowledged as much in the March 4 order but went on to point out that such reliance is risky where the federal securities laws come into play. At p. 556.

Perhaps the most appealing argument made by the Gunters is the argument to the effect that *D'Oench, Meo*, and *First National* cannot be extended to encompass the present situation. Although those cases are not squarely on point with this one, there is language in them which admits of a very broad interpretation. For example, in *First National*, the Ninth Circuit said,

> It is not necessary for the accommodation maker to have knowledge of the specific scheme of fraudulent arrangement to preclude the defense; it is sufficient that he *lends himself* to a scheme to aid the bank in concealing the true nature of the transaction, thus misrepresenting the note as a valid asset of the bank.

587 F.2d at 1012 (emphasis added). Likewise the Supreme Court in *D'Oench* stated that "[i]t would be sufficient in this case that the maker *lent himself* to a scheme or arrangement whereby the banking authority on which the respondent relied on insuring the bank was or was likely to be misled." 315 U.S. at 460, 62 S.Ct. at 681 (emphasis added).

Whatever the emphasized language means, the Court believes that any requirement of participation—however active or passive the participation must be—is outweighed by other factors. Specifically, the three inquiries mandated by *Kimbell Foods* apparently have not heretofore been applied in a case involving the FDIC's purchase and assumption transaction. In addition, neither *D'Oench* nor the subsequent cases have dealt with the application of Exchange Act section 29. The answers to the *Kimbell Foods* inquiries and the innocence of the FDIC as defined in section 29 require the Court to ignore any lack of active participation by the Gunters in the alleged fraud.

## II. Exchange Act Section 29

The thrust of the Gunters' argument with respect to section 29 is that the Court's March 4 order elevates form over substance in deciding that a transfer from the FDIC as receiver to the FDIC as insurer had occurred. The Court previously treated this argument in connection with the question of whether the transfer was in "good faith;" the discussion at the top of page 559, would apply equally to the question of whether there was a transfer. No other issue involving section 29 has been raised in the motion for reconsideration which has not already been fully considered.

## III. 1933 Act

With respect to the Court's holding on the application of Exchange Act section 29 to the 1933 Securities Act, the Court acknowledges the novelty and difficulty of the issue, but plaintiffs have not raised any issue which has not already been fully considered.

## IV. Summary—Motion for Reconsideration

For the foregoing reasons and for the reasons stated in the Court's order of March 4, 1980 the FDIC's motion for summary judgment is GRANTED and the motion for reconsideration is DENIED.

## MOTION FOR CERTIFICATION UNDER 28 U.S.C. § 1292(b) AND MOTION FOR ENTRY OF FINAL JUDGMENT

The Gunters have moved for certification of the Court's March 4 order under 28 U.S.C. § 1292(b). The FDIC apparently also agrees that the March 4 order should be immediately appealable, but it would prefer that any appeal be taken from a final judgment which it requests the Court to enter pursuant to Fed.R.Civ.P. 54(b).

Rule 54(b) provides as follows:

(b) *Judgment Upon Multiple Claims or Involving Multiple Parties.* When more than one claim for relief is presented in an action, whether as a claim, counter-

claim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

In opposition to the entry of final judgment the Gunters correctly point out that entry of final judgment does not automatically follow from the termination of the claim(s) against one of multiple parties. In addition they contend that in this case there are two "just reason[s] for delay."

They first contend that entry of judgment might require them to post a large bond on appeal, a requirement which they believe especially onerous in view of the novelty of the issues involved in the motion for summary judgment. They also assert that their cross-claim against the FDIC as "receiver" in a related case should succeed and act as a "set-off" against the claim of the FDIC in this case. This argument is based on the premise that in this case the FDIC as insurer has contended that the Gunters should have sued the receiver. Even if the term set-off is not construed in a narrow legal sense, but rather in a broad enough sense to comprehend simply the presence of two judgments of roughly equal amounts owed by two parties to each other, the Court does not believe the possibility that the Gunters will recover in another case material to whether the Court should enter judgment in this case.

█ The Gunters other argument would likewise have little merit in most cases. In this case, however, the Court believes that it would be particularly harsh to place the Gunters in a position where a large bond on appeal might be required. This harshness arises from the novelty and difficulty of the issues involved here. The Court has decided several issues and sub-issues as matters of first impression in arriving at its ruling on the FDIC's motion for summary judgment. The Court thus believes that the relationship between the FDIC and the Gunters should remain as nearly in *status quo* as possible, and thus in the language of Rule 54 the Court concludes that there is "just reason for delay" in entering final judgment.

█ 28 U.S.C. § 1292(b) provides:

(b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

The Court can hardly imagine a better case for certification under 12 U.S.C. § 1292(b). The ruling on the FDIC's motion for summary judgment required the Court to decide several questions of first impression, i.e., (1) the question of the applicability of 12 U.S.C. § 1823(e) to a fraud case, (2) the question of the presence and content of federal common law, (3) the question of the dual capacity of the FDIC with respect to whether a transfer can be made for the purposes of Exchange Act Section 29, and (4) the question of the applicability of Section 29 to the 1933 Act. In ruling against the Gunters, the Court has placed a large

**566**

practical burden on the Gunters. In the present posture of the case they must attempt to prove fraud against numerous defendants and if successful to collect what could be substantial damages from them. If the Gunters were not liable to the FDIC on the note, then they would have substantially less incentive, and the FDIC substantially more incentive, to pursue the case. Thus the FDIC's motion, as a practical matter, raises the question of who will bear the ultimate burden of moving the litigation forward. If the Gunters were to proceed with the case on the basis of this Court's ruling and an appellate court were ultimately to disagree with this Court, then the case would have to be relitigated. Such a procedure would be a tremendous cost to all of the many parties to this case in time and legal expenses.

Thus the Court concludes that the Court's order of March 4 "involves a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation . . . ." 28 U.S.C. § 1292(b).

Accordingly, for the foregoing reasons, the plaintiffs' motion for certification is hereby GRANTED and the FDIC's motion for entry of judgment is DENIED. Further, the order of March 4 is hereby amended to include the above certification.

The Court has not considered the question of whether a stay of proceedings pending appeal would be appropriate.

SO ORDERED.